SOUTHERN RY. CO. v. SOUTH CAROLINA PUBLIC SERVICE COMMISSION et al.

District Court, E. D. South Carolina, Columbia Division.

Feb. 26, 1940.

Sidney S. Alderman, of Washington, D. C. (Frank G. Tompkins, of Columbia, S. C., on the brief), for plaintiff.

Irvine F. Belser, of Columbia, S. C. (John M. Daniel, of Columbia, S. C., on the brief), for defendants.

Before PARKER, Circuit Judge, and MYERS and LUMPKIN, District Judges.

PARKER, Circuit Judge.

This is a suit, instituted by the Southern Railway Company against the members of the South Carolina Public Service Commission and the Governor and the Attorney General of that state, to enjoin them from attempting to enforce against the Railway Company penalties for discontinuing the operation of two certain passenger trains between Branchville, S. C., and the South Carolina-Georgia state line. An interlocutory injunction was asked and a court of three judges was constituted pursuant to section 266 of the Judicial Code, 28 U.S.C.A. § 380. The hearing on the application for interlocutory injunction was continued and the case was submitted for final decree on the date to which continuance was granted. No question arises as to the jurisdiction of the court, since the case arises under the Constitution and laws of the United States. More than $3,000 is involved, administrative remedies have been exhausted and irreparable injury is threatened if the position of plaintiff is well grounded. The Johnson Act of May 14, 1934, 48 Stat. 775, 28 U.S.C.A. § 41(1, 1a), has no application, since the suit does not involve a question of rates and, on the allegations of the complaint, does involve an interference with interstate commerce.

Plaintiff, the Southern Railway Company, is operating a line of railroad in the State of South Carolina, extending from Charleston to the South Carolina-Georgia line at Augusta, 136.91 miles in length, constructed under a charter granted by the State of South Carolina to the South Carolina Canal and Railroad Company in 1827. The road was built from Charleston to Aiken, S. C. in the year 1833 and, at the time of its construction, was the longest continuous railroad in the world. The franchise of the original company passed, by sundry reorganizations and foreclosures, through the South Carolina Railroad Company, the South Carolina Railway Company, and the South Carolina and Georgia Railroad Company, and came finally into the hands of the Southern Railway-Carolina Division, by which it was leased to the plaintiff, Southern Railway Company, under a 999-year lease. It is operated by plaintiff as a part of its interstate system of railways, the portion of the line extending from Charleston to Branchville, 61.91 miles in length, being

used by plaintiff as a part of its main line from Charleston to Columbia. The remainder of the line, approximately 75 miles in length, being the portion between Branchville and Augusta, serves as a highway for traffic of local origin or destination and also for freight from Charleston to Augusta and the West.

As a result of the building of good roads and the use of buses and private automobiles, plaintiff has experienced a loss of passenger traffic, especially that of a local character. It has reduced the passenger service on the 75 mile stretch of this railroad to one train a day each way between Branchville and Augusta, and finds that even this minimum service results in a loss. For the year September 1937 to August 1938 the total revenue derived from the operation of the two trains was $16,990.29, of which amount $4,819.50 was for passenger fares, $8,417.34 was for carrying mail and $3,753.45 was for carrying express; whereas the expense of operation was $31,774.98, involving a loss of $14,784.69. For the ten months' period from October 1938 to July 1939, the loss of operation was $10,920.58; and for the four months' period from August to October 1939 it was $5,225.36. For this reason plaintiff desires to abandon all passenger service on the portion of the line between Branchville and Augusta, while continuing to use that portion of the line for transportation of freight and while maintaining passenger service over the Branchville-Charleston portion of the line as a part of its main line between Columbia and Charleston. It accordingly applied to the South Carolina Public Service Commission for leave to discontinue the passenger service of one train a day each way which it was operating between Branchville and Augusta, setting forth the loss arising from the operation of these trains, the fact that the entire passenger service of the system was being operated at a loss and in South Carolina at a greater proportionate loss than on the system as a whole, and that upon its entire operations it was not earning an adequate return upon invested capital and must necessarily effect economies by the elimination of operations involving loss. It urged that the need for passenger service through the territory served by these trains was supplied by the buses and private automobiles that used the state highways and that the public had largely abandoned the use of the trains for passenger service.

The Public Service Commission denied the application of plaintiff for leave to discontinue the trains and abandon passenger service on the portion of the road between Branchville and Augusta on the ground that the maintenance of passenger service is required by the franchise under which the road is operated, that the discontinuance of the trains in question would leave the communities on that portion of the road without adequate service for express and mail as well as without rail passenger service, and that, to insure the fair treatment of these communities contemplated by the statutes of the state, the operation of the trains should be continued. Summing up its conclusions, the Commission said:

"The Commission is of the opinion and finds that when the Southern Railway Company succeeded to and possessed itself of the rights and franchises conferred by the charters of the four railroad companies forming Southern Railway-Carolina Division, it assumed all the duties which are imposed upon it by the said charters or the general laws of this State, and that the said railroad company should not be permitted to pick and choose and to serve only those portions of its railroad which it finds most profitable.

"The right of carriage or transportation of persons is granted by the charter of this particular line of railroad to the Southern Railway Company and this Commission further finds that it can and should require the applicant carrier to perform a rail passenger service over that portion of its line between Branchville, S. C., and the South Carolina-Georgia state line, even at a loss if need be, as long as it retains any of the benefits of the charter.

"Upon consideration of the evidence of record the Commission is further of the opinion and finds that the discontinuance of train numbers 17 and 18 operating between Branchville, S. C., and Augusta, Ga., and serving stations on the Southern Railway Company in South Carolina, affect the small communities and these communities will be left without rail passenger service for the handling of passengers, express, newspapers, parcel post and other mail.

"Equality of treatment or near equality, has been one of the chief purposes underlying regulatory statutes. Regulatory statutes clearly show the intent to insure fair treatment to small communities and their

inhabitants. In section 8251 of the Civil Code (1932) the Commission is given general supervision of all railroads in this State and in section 8405, the better to secure connections, the Commission may require all persons, associations or corporations operating any railroad or railroads to run at least one unmixed daily passenger each way over such railroad or railroads. The discontinuance of these trains removes all rail passenger service and eliminates rail connections at Branchville, Blackville, Aiken and other stations."

It is the contention of plaintiff that this order of the Commission, which, in effect, requires it to continue unprofitable passenger service between Branchville and Augusta, is so arbitrary and unreasonable as to amount to a denial of the due process and equal protection guaranteed by the 14th Amendment, and that, since the loss arising from the operation must be paid from revenues derived from interstate commerce, the order constitutes a burden upon that commerce in violation of the commerce clause of the Constitution.

■ A sufficient answer to both positions of plaintiff is that it has accepted from the State of South Carolina a franchise imposing upon it the burden of maintaining passenger service over this line of railroad, and that it cannot separate the benefits from the burdens of the franchise and accept one while rejecting the other. If it chooses to use in its operations this line of railroad which owes its existence to the State of South Carolina, it must operate the line in accordance with its charter and the laws of the state, unless relieved therefrom by state authority. If interstate operations are burdened by state requirements, relief may be had by application to the Interstate Commerce Commission to abandon the line or part of it. 49 U.S.C.A. § 1(18–20); Georgia v. United States, D.C., 28 F.Supp. 749; Colorado v. United States, 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878. The question before us is not whether the action of the state authorities of which complaint is made is wise, but whether it is unlawful; and, in view of the charter obligation of the plaintiff to maintain passenger service on the road in question, we cannot see how an order of the Public Service Commission refusing to permit abandonment of passenger service on a portion of the line can be said to be unlawful.

■ The plaintiff denies that it is charged with any duty under the charter of the road or the law of South Carolina to maintain passenger service. We have looked into the matter with some care, however, and have no doubt as to the duty being thus imposed. The charter of the South Carolina Canal and Railroad Company, under which plaintiff exercises its franchise to operate the line, provides that the company shall "at all times have the exclusive right of transportation of persons, merchandise and produce over the railroad and railroads and canals to be by them constructed". VIII Statutes p. 360. This undoubtedly confers the privilege of transporting passengers as well as freight over the line of road to be constructed; and with the privilege is imposed the duty of rendering this service. The rule to this effect is well established in South Carolina. City of Spartanburg v. South Carolina Gas & Electric Co., 130 S.C. 125, 125 S.E. 295; State v. Broad River-Power Co., 157 S.C. 1, 153 S.E. 537, 547-549, affirmed 281 U.S. 537, 50 S.Ct. 401, 74 L.Ed. 1023. In the case last cited, which involved an attempt to abandon electric railway service in the City of Columbia, the Supreme Court of South Carolina said:

"It is the contention of the petitioners that 'a franchise is the privilege of doing that 'which does not belong to citizens of the country generally by common right,' and that such franchises are granted primarily for the public benefit and when accepted constitute a contract, and that the grantee undertakes in consideration for the privilege granted to perform the services authorized. This position, in my opinion, is well supported by authority and cannot be successfully questioned. See 12 R.C.L. 174–175; People's Pass. R. Co. v. Memphis City R. Co., 10 Wall. 38, 19 L.Ed. 844; New Orleans Gaslight Co. v. Louisiana Light & Heat Producing & Mfg. Co., 115 U.S. 650, 6 S.Ct. 252, 29 L.Ed. 516; 12 R.C.L. 179–180; 26 C.J. 1014; 12 R.C.L. 199–200; McCandless v. R. R. Co., 38 S.C. 103, 16 S.E. 429, 18 L.R.A. 440; 26 C.J. 1030; Brownell et al. v. Old Colony R. R. Co., 164 Mass. 29, 41 N.E. 107, 29 L.R.A. 169, 49 Am.St.Rep. 442.

"Therefore the company cannot be permitted to abandon the electric railway service while retaining the electric light and power privileges."

■ As the question involved is the interpretation of a statute of South Caro-

712

lina, it is elementary that it must be decided in accordance with the law as laid down by the Supreme Court of that state. See 25 C.J. 831; 14 A.J. 393; Georgia Ry., & Power Co. v. Decatur, 262 U.S. 432, 438, 43 S.Ct. 613, 67 L.Ed. 1065. It is not amiss to note, however, that the rule that the acceptance of a public utility franchise imposes the duty of rendering to the public the service therein contemplated is one of general acceptation. United Fuel Gas Co. v. Railroad Com. of Kentucky, 278 U. S. 300, 309, 49 S.Ct. 150, 73 L.Ed. 390; Fort Smith Light & Traction Co. v. Bourland, 267 U.S. 330, 45 S.Ct. 249, 69 L.Ed. 631; Chesapeake & O. Ry. v. Public Service Commission, 242 U.S. 603, 37 S.Ct. 234, 61 L.Ed. 520; 12 R.C.L. 199.

 In addition to this, a statute of South Carolina (Acts of 1882, XVII 830, sec. 8395, Code of 1932) requires that "every railroad corporation shall furnish reasonable accommodations for the convenience and safety of passengers". The Act of February 19, 1902, Acts 1902, pp. 1152, 1153, under which the South Carolina and Georgia Railroad Co., which then held the franchise, was merged with other railroad corporations to form the Southern Railway-Carolina Division, provided that the consolidated company should "keep up and continue to operate in a safe and proper manner, all portions of the line of railroad of the * * * several constituent companies * * *." Under that act, lease to the plaintiff Southern Railway Company was authorized; and under the lease plaintiff expressly agreed to discharge all duties and obligations imposed upon the lessor by the State of South Carolina "in respect to its duties as a common carrier of freight and passengers or as the owner and lessor of said demised lines of railroad, and to that end specifically agrees to operate the same as a railroad at all times during the said time". It appears, therefore, that not only do the laws of South Carolina require adequate provision for passengers by the railroads of the state, but also that, in accepting its lease, plaintiff expressly agreed to discharge this duty.

Since, therefore, plaintiff is charged with the duty under its franchise of maintaining passenger service on the entire line of the railroad, an order enforcing that duty may not be said to be unreasonable and arbitrary merely because its performance may result in loss to plaintiff. Atlan-

tic Coast Line v. North Carolina Corporation Com'n, 206 U.S. 1, 27 S.Ct. 585, 51 L.Ed. 933, 11 Ann.Cas. 398; Missouri Pac. Ry. Co. v. Kansas, 216 U.S. 262, 30 S.Ct. 330, 54 L.Ed. 472; Chesapeake & O. Ry. Co. v. Public Service Commission, supra; Fort Smith Traction Co. v. Bourland, supra; State v. Broad River Power Co., supra. As said by Mr. Justice (later Chief Justice) White in the Atlantic Coast Line case [206 U.S. 1, 27 S.Ct. 595, 51 L.Ed. 933, 11 Ann.Cas. 398], "As the primal duty of a carrier is to furnish adequate facilities to the public, that duty may well be compelled, although, by doing so, as an incident some pecuniary loss from rendering such service may result."

A case directly in point is Missouri Pac. Ry. Co. v. Kansas, supra, 216 U.S. 262, 263, 279, 30 S.Ct. 330, 336, 54 L.Ed. 472, where an order directing the running of a passenger train was objected to as arbitrary and unreasonable on the ground that the train could not be run except at loss to the company. In rejecting this contention, the Supreme Court, speaking through Mr. Justice (later Chief Justice) White, said:

"The fact that the performance of the duty commanded by the order which is here in question may, as we have conceded for the purpose of the argument, entail a pecuniary loss, is, of course, as declared in the Atlantic Coast Line case, as a general rule, a circumstance to be considered in determining its reasonableness, as are the other criteria indicated in the opinion in that case. *But where a duty which a corporation is obliged to render is a necessary consequence of the acceptance and continued enjoyment of its corporate rights, those rights not having been surrendered by the corporation, other considerations are, in the nature of things, paramount, since it cannot be said that an order compelling the performance of such duty at a pecuniary loss is unreasonable.* To conclude to the contrary would be but to declare that a corporate charter was purely unilateral, that is, was binding in favor of the corporation as to all rights conferred upon it, and was devoid of obligation as to duties imposed, even although such duties were the absolute correlative of the rights conferred. Was the duty which the order here commanded one which the corporation was under the absolute obligation to perform as the result of the acceptance of the charter to operate the road, is then the question to be considered.

"It may not be doubted that the road, by virtue of the charter under which the branch was built, was obliged to carry passengers and freight, and therefore as long as it enjoyed its charter rights was under the inherent obligation to afford a service for the carrying of passengers. In substance, this was all the order commanded, since it was confined to directing that the road put on a train for passenger service." (Italics supplied.)

The rule was succinctly stated by Mr. Justice Brandeis in Fort Smith Light & Traction Co. v. Bourland, supra, where an order was sustained directing a street railway company to continue operating a part of one of its lines, though it was unremunerative and would have to be rebuilt at great expense to conform to a change of street grade, and although the railway as a whole, under existing rates, was not earning a fair return. He said: "The order complained of does not deal with rates. Nor does it involve the question of the reasonableness of service over a particular line. Compare Atlantic Coast Line R. R. Co. v. Corporation Commission, 206 U.S. 1, 23–27, 27 S.Ct. 585, 51 L.Ed. 933, 11 Ann.Cas. 398; Railroad Commission v. Mobile & Ohio R. R. Co., 244 U. S. 388, 37 S.Ct. 602, 61 L.Ed. 1216. It merely requires continued operation. We cannot say that it is inherently arbitrary. *A public utility cannot, because of loss, escape obligations voluntarily assumed.* Milwaukee Electric Ry. Co. v. Milwaukee, 252 U.S. 100, 105, 40 S.Ct. 306, 64 L.Ed. 476, 10 A.L.R. 892. The fact that the company must make a large expenditure in relaying its tracks does not render the order void. Nor does the expected deficit from operation affect its validity. A railway may be compelled to continue the service of a branch or part of a line, although the operation involves a loss. Missouri Pacific Ry. Co. v. Kansas, 216 U.S. 262, 279, 30 S.Ct. 330, 54 L.Ed. 472; Chesapeake & Ohio Ry. Co. v. Public Service Commission, 242 U.S. 603, 607, 37 S.Ct. 234, 61 L.Ed. 520. Compare Railroad Commission v. Eastern Texas R. R. Co., 264 U.S. 79, 85, 44 S.Ct. 247, 68 L.Ed. 569. *This is true even where the system as a whole fails to earn a fair return upon the value of the property.* So far as appears, this company is at liberty to surrender its franchise and discontinue operations throughout the city. It cannot, in the absence of contract, be compelled to continue to operate its system at a loss.

Brooks-Scanlon Co. v. Railroad Commission of Louisiana, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323. But the Constitution does not confer upon the company the right to continue to enjoy the franchise or indeterminate permit and escape from the burdens incident to its use." (Italics supplied.)

The company relies particularly upon the case of Mississippi Railroad Commission v. Mobile & Ohio R. Co., 244 U.S. 388, 37 S.Ct. 602, 61 L.Ed. 1216. That decision, however, is not in point. It dealt with an order requiring the running of additional trains over a road where adequate passenger service was already being furnished, not with an order requiring the maintenance of a minimum passenger service which the railroad company was proposing to discontinue in the face of a charter obligation to maintain it. Nor is Brooks-Scanlon Co. v. Railroad Commission, 251 U.S. 396, 40 S.Ct. 183, 184, 64 L.Ed. 323, another case relied on by plaintiff, in point. That case merely held that a lumber company which had been operating a railroad as an adjunct of its business could not be compelled to continue the operation of the railroad merely because it continued to operate the lumber business. In holding that the lumber company might not be compelled to operate the railroad, the Court expressly distinguished such a case as we have here, saying: "It is true that if a railroad continues to exercise the power conferred upon it by a charter from a State, the State may require it to fulfill an obligation imposed by the charter even though fulfillment in that particular may cause a loss. Missouri Pacific Ry. Co. v. Kansas, 216 U.S. 262, 276, 278, 30 S.Ct. 330, 54 L.Ed. 472."

Even if there were no charter obligation with respect to maintaining passenger service over this entire line of railroad, we do not think that the order of the Commission denying to the company the right to discontinue all passenger service on this portion of the line could be held arbitrary and unreasonable so as to fall under the condemnation of the due process or the equal protection clause. The State of South Carolina, for the convenience and welfare of its people, had chartered this line of railroad from Charleston to Augusta. People along the line had been served by it for over a hundred years. The discontinuance of the

trains in question would leave those on a large part of the line without the benefit of passenger service and without the benefit of the express and mail service dependent upon the operation of passenger trains. The company intends to use the Branchville-Augusta portion of the line for the hauling of freight because of its "convenience value", as explained by one of the witnesses. We cannot say that it was arbitrary and unreasonable for the Commission to consider the "convenience" of the communities served and order that the company continue to maintain the customary service ordinarily afforded by railroad companies over it. If the figures of the company are accepted, the deficit attributable to the operation of this portion of the line was $201,306.53 in 1937 and $171,269 in 1938. The loss arising from the operation of the passenger trains was less than one-tenth of this total. If the operation of this portion of the line is so important to plaintiff's system that it desires to continue it notwithstanding the apparent loss, it would not seem unreasonable for the Commission to require that normal operation with a minimum of passenger service be continued, where the maintenance of passenger trains is undoubtedly of value to the communities served and is responsible for so small a portion of the loss.

Plaintiff is, of course, interested primarily in using the road as an integral part of its great interstate system. It accordingly uses the 61-mile portion between Branchville and Charleston as a part of its main line from Columbia to Charleston, runs excellent trains over it and has no idea of abandoning passenger service so far as that portion is concerned. Likewise it proposes to use the Branchville-Augusta portion for the convenience of its system in the hauling of freight. The Commission, however, must look to the interest of the people of South Carolina, as well as to that of the railway system; and we cannot think that, in the light of the purpose for which the charter was granted, it is arbitrary and unreasonable action to require that passenger service be continued over the entire line, and not merely on the portion where operation is to the advantage of plaintiff's system. "The primary duty of a public utility is to serve on reasonable terms all those who desire the service it renders. This duty does not permit it to pick and choose and to serve only those portions of the territory which it finds most profitable, leaving the remainder to get along without the service which it alone is in a position to give. An important purpose of state supervision is to prevent such discriminations." United Fuel Gas Co. v. R. R. Com. of Kentucky, 278 U.S. 300, 309, 49 S.Ct. 150, 152, 73 L.Ed. 390.

It is to be noted in this connection that the Commission is empowered by the legislature of South Carolina to require railroad corporations "to run at least one unmixed daily passenger train each way" over their lines. Sec. 8405 of the Code of 1932. It is argued by plaintiff that this is a recognition of the fact that under the law of South Carolina no duty is imposed by charter to render passenger service, that matter being left to the discretion of the Commission. We do not so conclude. The duty of railroad companies to furnish passenger service, as we have seen, is unquestionably imposed by the law of the state; but the general law does not prescribe what service shall be a sufficient discharge of the duty. Section 8405 vests discretion as to this in the Commission, authorizing it to require the running of passenger trains; as distinguished from mixed trains, and to require one such train a day each way instead of the less frequent service that might be offered in discharge of the duty. For the Commission to exercise its discretion under the statute to require this minimum service on a regular railroad line of the character here involved cannot be said to be unreasonable. It must be remembered that the issue before the Commission was not whether the plaintiff should be required to furnish more or less passenger service over the portion of the line in question, but whether it should be permitted to abandon all passenger service over it.

What we have said answers, we think, not only the plaintiff's contention that the order violates the due process and equal protection clauses of the 14th Amendment, U.S.C.A.Const., but also the contention that it imposes an undue burden on interstate commerce in violation of the commerce clause, art. 1, § 8, cl. 3. If the plaintiff uses as a part of its interstate system a line of railroad chartered by the state for local purposes, the use must be subject to the regulation of local operations by the state authorities and to the performance of obligations imposed by the law of its being. Missouri Pac. Ry. Co.

v. Kansas, 216 U.S. 262, 283, 30 S.Ct. 330, 54 L.Ed. 472. As said by the Supreme Court, speaking through Mr. Justice Frankfurter in the recent case of Palmer v. Commonwealth of Massachusetts, 308 U.S. 79, 60 S.Ct. 34, 37, 84 L.Ed. ——: "The dependence of local communities on local railroad services has for decades placed control over their curtailment within the regulatory authorities of the state. Even when the Transportation Act in 1920, 49 U.S.C.A. § 1(18–20), gave the Interstate Commerce Commission power to permit abandonment of local lines when the overriding interests of interstate commerce required it, Colorado v. United States, 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878, this was not deemed to confer upon the Commission jurisdiction over curtailments of service and partial discontinuances. Public Convenience Application of Kansas City Southern Ry., 94 I.C.C. 691; see Proposed Abandonment, Morris & Essex Ry. Co., 175 I.C.C. 49."

The question here involved is not essentially different from that which was before the court in South Carolina Highway Department v. Barnwell Bros., 303 U.S. 177, 58 S.Ct. 510, 515, 82 L.Ed. 734, in which the District Court thought that certain state regulations affecting the use of trucks upon the highways imposed an undue burden upon interstate commerce. In reversing the decision below, the Supreme Court said: "From the beginning it has been recognized that a state can, if it sees fit, build and maintain its own highways, canals, and railroads, and that in the absence of congressional action their regulation is peculiarly within its competence, even though interstate commerce is materially affected. Minnesota Rate Cases; Simpson v. Shepard, 230 U.S. 352, 416, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann.Cas.1916A, 18. Congress not acting, state regulation of intrastate carriers has been upheld regardless of its effect upon interstate commerce. Id."

This court recognizes the important problems confronting the railroads as the result of changing conditions of transportation. Undoubtedly, unprofitable service must be curtailed if the great railway systems are to be preserved and the country is to be secured in the enjoyment of the transportational facilities which they afford. The problem is complicated by reason of the fact that lines of railroad made use of by railway systems are char-tered by the several states and are subject to state regulation with respect to local operations, and that considerations of local pride and convenience are not infrequently allowed to outweigh, in the minds of local authorities, the interests of economical and efficient administration. The problem presented, however, is primarily one for Congress and not for the courts. As an aid in its solution, Congress has conferred upon the Interstate Commerce Commission authority to authorize the discontinuance of any line or part of a line of railroad, notwithstanding charter provisions or local laws requiring operation. 49 U.S.C.A. § 1(18–20); Georgia v. United States, supra; Colorado v. United States, supra. If it is deemed wise to permit the abandonment of unprofitable passenger service on lines which the roads continue to operate for the hauling of freight, Congress can authorize the Commission to permit such abandonment, notwithstanding charter requirements and regulatory orders of state commissions; but, until Congress acts, the courts are without power to afford relief merely because of the burden upon interstate commerce which such service entails. As said by Mr. Justice Stone in South Carolina Highway Department v. Barnwell Bros., supra: "Congress, in the exercise of its plenary power to regulate interstate commerce, may determine whether the burdens imposed on it by state regulation, otherwise permissible, are too great, and may, by legislation designed to secure uniformity or in other respects to protect the national interest in the commerce, curtail to some extent the state's regulatory power. But that is a legislative, not a judicial, function, to be performed in the light of the Congressional judgment of what is appropriate regulation of interstate commerce, and the extent to which, in that field, state power and local interests should be required to yield to the national authority and interest. In the absence of such legislation the judicial function, under the commerce clause * * * as well as the Fourteenth Amendment, stops with the inquiry whether the state Legislature in adopting regulations such as the present has acted within its province, and whether the means of regulation chosen are reasonably adapted to the end sought."

Congress has dealt with the burden on interstate commerce resulting from state requirements of service by authorizing the abandonment of all service on

716

any line or part of a line, where the Interstate Commerce Commission after giving consideration to the public interest so determines. On the principle expressio unius est exclusio alterius, this is clear indication of intention not to interfere with the power of the states to require service in cases where there is no abandonment pursuant to the statute. It is hardly thinkable that the railroads should be permitted to abandon passenger service in defiance of state requirements upon a showing that the service is operated at a loss and constitutes a burden upon interstate commerce, whereas to abandon both freight and passenger service on the same grounds they must apply for leave to the Interstate Commerce Commission. Especially is this true in light of the fact that "it has become the settled social policy both of the states and the nation to entrust the type of public interest here in question to expert administrative agencies because of 'the notion', * * * 'that a judge is not qualified for such duties.'" Palmer v. Commonwealth of Massachusetts, supra.

For the reasons stated, we are of opinion that the injunction should be denied and the bill of complaint dismissed, and decree will be entered accordingly. We file herewith our findings of fact and conclusions of law as required by Rule 52 (a), Rules of Civil Procedure, 28 U.S.C.A. following section 723c. It will be noted that we have covered in the findings a number of matters which are not material to the decision in the view which we take of the law. This is done because these matters are covered by the evidence and the parties have requested findings in regard thereto, and to the end that the Supreme Court, if there be an appeal, may have before it complete findings as to the matters relied on before us.

Injunction denied and bill dismissed.