WILLIAM H. O'CONNOR ET AL., PROSECUTORS-APPEL-
LANTS, v. BOARD OF PUBLIC UTILITY COMMISSION-
ERS AND PENNSYLVANIA-READING SEASHORE LINES,
DEFENDANTS-RESPONDENTS.

Argued May 20, 1942—Decided December 3, 1942.

For the appellants, *Edward C. Waddington.*

For the Board of Public Utility Commissioners, *John A. Bernhard.*

For the respondent Pennsylvania-Reading Seashore Lines, *Floyd H. Bradley* (*Grace Heritage Smith,* and *H. Merle Mulloy* and *Windsor F. Cousins,* of the Philadelphia bar, on the brief).

The opinion of the court was delivered by

PARKER, J. The fundamental and decisive question to be answered in this case, is whether the Board of Utility Commissioners is vested by our statutes with power to permit a

railroad company organized and operating under the General Railroad Act (*R. S.* 48:12-1 to 167) to abandon all passenger train service on certain of its lines, while continuing freight operation thereon.

The petition of the company (verified in November, 1939, date of filing not stated in the printed book) asked for approval of "discontinuance of all passenger train service" on three branch lines, and "reduction and rearrangement of passenger train service" on a fourth. The approval was granted, there being no appearance in the "reduction" case, which is not before us. As to the other three, the Board granted "the application to abandon service on the three branches" over the protest of "numerous commuters" and directed the railroad "to post notice of * * * the abandonment of passenger service on the three branches" in stations and cars. The words "abandonment" and "discontinuance" seem to have been used synonymously, and we discern no material difference. Obviously a total cessation of passenger service was intended and granted, without limit of time.

The Railroad Act, by section 48:12-99 of the Revised Statutes provides that "every railroad company shall start and run trains for the transportation of persons and property at regular times to be fixed by public notice;" and "shall take, transport and discharge such passengers and property * * * on the due payment of the legal fare and freight. * * *" This requirement is nothing new in our statute law. In the General Railroad Act of 1873, *Pamph. L., pp.* 88, 102, Revision of 1877, page 932, section 26 provided "that every such corporation shall start and run their cars (*sic*) for the transportation of passengers and property, at regular times, to be fixed by public notice; and shall furnish sufficient accommodations for the transportation of all such passengers and property as shall within a reasonable time previous thereto be offered for transportation at the place of starting, and the junctions of other railroads, and at usual stopping places established for receiving and establishing way passengers and freights for that train; and shall take, transport and discharge such passengers and property at, from

and to such places, on the due payment of the freight or fare legally authorized therefor; and shall be liable to the party aggrieved in an action for damages for any neglect or refusal in the premises." As to this, the late Chancellor McGill remarked, in *Nation Docks' Co.* v. *United Companies,* 53 *N. J. L.* 217 (at *p.* 228) : "The design of the law is to subserve the public good. Consequently, every railroad incorporated under it is expressly required to transport such passengers and property as shall be properly offered for transportation at its depots." The language of the 1873 act was repeated without substantial change in the Railroad Act of 1903, *Pamph. L., pp.* 645, 665; *Comp. Stat. of* 1910, *p.* 4239, § 37 : so that for about seventy years the statutory obligation to carry passengers has been in force.

Coming now to the jurisdiction in the premises of the Board of Public Utilities, it is obvious, of course, that the powers of that Board are defined and limited by the statute, the pertinent section being *R. S.* 48:2-13, which reads as follows :

"The board shall have general supervision and regulation of and jurisdiction and control over all public utilities as hereinafter in this section defined and their property, property rights, equipment, facilities and franchises so far as may be necessary for the purposes of carrying out the provisions of this title."

The next paragraph, which need not be quoted at length, includes expressly "every * * * corporation * * * that may own * * *, operate, manage or control * * * any steam railroad * * * for public use, under privileges granted * * * by this state * * *."

It is hornbook law that a public service corporation enjoying special franchises as a grant from the public in consideration of service to be performed for the public, having the right of eminent domain, and in the case of a railway, having the right of way at road crossings, must either exercise the franchise as required by law, or surrender it. The Massachusetts case of *Commonwealth* v. *Filchburg Railroad Co.,* 12 *Gray* 180, cited by the Board, seems plainly distinguish-

able because the court said in that case (at *p*. 187) "neither the statutes under which the respondents hold their franchises, nor the general laws regulating railroad companies, in terms impose upon the respondents such duty" (to run regular passenger trains on branch roads).

The present situation of the railroad corporation is one closely connected with the general history of transportation, particularly in this state. In the beginning there were a few Indian trails through an otherwise trackless wilderness, and navigation by boats, larger or smaller, on the rivers and creeks. Prior to the steamboat, the so-called "Durham boat" was an important vehicle on some of the rivers. Later, roads were made, primitive in character and devoid of what is called metal, so that in bad weather they were almost impassable and public transportation over them was by stage coach or stage wagon. The steamboat at the opening of the 19th century was a great step in advance, but, of course, was confined to navigable waters. The canal came into being a few years later, and succeeded for a time particularly as regards slow moving freight, but it is now practically extinct. Slightly over a century ago came the railroad; and its value as a means of transportation was immediately appreciated, and to such an extent as to create considerable competition between localities for the privilege of having a railway come to them; as, for example, in Burlington. In many of the towns the railway tracks ran down the middle of the principal street. Railway and steamer transportation was in some cases combined as, for instance, the Camden and Amboy Railroad, a through line between Philadelphia and New York with a terminus at South Amboy and steamer transportation thence to New York City both through Staten Island Sound and the lower bay of New York. So long as the common roads remained subject to weather conditions because of soft surfacing, and the use of vehicles was confined to horses and sometimes oxen, the railroads were distinctly in the saddle, not only as regards their trunk lines, but with respect to numerous branch lines extending to places not on the main lines. Instances of this in the northern part of the state were

the branch line of Rahway to Perth Amboy, a spur to Millstone from the Pennsylvania lines, the High Bridge branch from the Central Railroad of New Jersey: the Chester branch from the Morris and Essex, the Trenton branch from the Reading: and the Sussex Railroad itself may be considered as one of these branches. All these branches did both a freight and passenger business, though it may be said to be common knowledge that the freight business was the principal consideration. But with the invention and development of the motor vehicle at the end of the 19th century a radical change of conditions ensued. The speed of a motor vehicle, even at the very outset, discounted that of the horse, and with the increase in the number of motor vehicles there came the insistent demand for better roads on which to use them. The telford and macadam roads were already in use to some extent and more roads of a similar character were imperatively demanded. Some years ago the late Edwin A. Stevens, who was appointed by Governor Woodrow Wilson as road commissioner, wrote an article for Scribner's Magazine on the subject of improved roads, and in that article ventured the prediction that in constructing roads in the future it would be necessary for the engineers to anticipate a speed limit of forty miles an hour. Such a prediction seems laughable at this day, but was entirely reasonable at that time, which must have been about 1912. The effect of these improved roads and improved motor vehicles on the railroad situation is, of course, known to all. As regards short runs for freight, the motor truck may take on its load directly at the factory and discharge it at the warehouse, miles away. As regards passengers, the motor bus has pervaded the country and, together with the private automobile, has deprived the railroads of vast numbers of passengers formerly carried; and it is precisely this last feature of the situation which prompted the applications to the Public Utility Commissioners that are before us in the present case. It is the case of three branch railroads, alike in character, endowed with the privileges already mentioned, but on terms prescribed in the Railroad Act of performing the double duty of carriage,

on the one hand of freight, and on the other hand of passengers, and, finding that the carriage of passengers is done at considerable loss, seeking to obtain from the state regulatory agency a release of the obligation to carry passengers while retaining all the franchises that were granted partly in consideration of that obligation.

We are of opinion that the cessation of the carriage of passengers would be clearly a breach of the contract (and indeed this seems not to be denied), and further that no power of the Utility Board to waive this contract obligation and erase it from the contract is conferred by statutes either expressly or by implication. See *"Petition of Boston and Maine Railroad,"* 82 *N. H.* 116; 129 *Atl. Rep.* 880. The statutory requirement in our Railroad Act is specific, and in nowise countervailed by regulatory powers granted in the Utilities Act.

The judgment of the Supreme Court will be reversed, and a judgment entered in this court setting aside the decision of the Utility Commission and denying the application for a discontinuance or abandonment of passenger service on the three branches. *Hoxsey* v. *Paterson,* 39 *N. J. L.* 489.

HEHER, J. (Dissenting.) I am in accord with the reasoning and result of the opinion of Mr. Justice Bodine for the Supreme Court.

I do not read *section* 48:12-99 of the Revision of 1937 as imposing upon railroads an absolute duty to operate trains for the transportation of persons and property. Viewed in the light of the context and the statutes *in pari materia,* it seems to me that, as stated by Mr. Justice Bodine, the obligation is measured by the public interest, necessity and convenience; and these considerations do not, in my opinion, lay upon the respondent railroad the duty of continuing passenger train service in the circumstances here presented. From the year 1933 to 1939 (when the instant application was presented to the Utility Commission) the railroad incurred annual deficits varying between $2,000,000 and $3,000,000, and aggregating $17,448,289. The consequence

was that, at the close of the year 1939, the company's liabilities exceeded its assets by more than $17,000,000. Passenger traffic has dwindled almost to the vanishing point. The elimination of this service on the branches in question will result in an annual saving of $74,000. And the public need in this regard is well served by parallel bus lines. Indeed, the competition thus afforded has been a major factor in the drastic reduction of rail patronage.

The essential question is one of statutory construction. *Section* 48:2-13 of the Revision invests the Utility Commission with "general supervision and regulation of and jurisdiction and control over all public utilities," as therein defined, "and their property, property rights, equipment, facilities and franchises so far as may be necessary for the purpose of carrying out the provisions" of that title. The annexed proviso excludes from such supervision and regulation, jurisdiction and control, taxicabs, hotel buses, school buses, and autobuses with a carrying capacity of not more than six passengers operated under municipal consent upon a route established wholly within the limits of a single municipality, which route does not parallel upon the same street the line of a street railway, traction railway, or any other autobus route. Railroads are not within the excepted category. Thus they are comprehended in the general class made the subject of the substantive enacting clause, *i. e.*, *all* public utilities.

As pointed out by the Supreme Court, this provision was long since construed by this court as designed "to give full control of all public utilities" to the administrative agency thereby constituted, "so far as it could be done by legislation." *Atlantic Coast Electric Railway Co.* v. *Public Utility Board,* 92 *N. J. L.* 168, 169. This all-inclusive interpretation was reiterated by this court in *Perth Amboy* v. *Board of Public Utility Commissioners,* 98 *Id.* 106. Applying this principle to a case where a traction company's suburban lines were operated at a substantial annual loss, Mr. Justice Swayze said: "Whether the railway shall run some parts of its line at a loss, perhaps with a view to future development or future

gain, perhaps with a view to greater public service, is a business question to be determined by the railway subject to the control of the public utility commission." *Trenton* v. *Trenton and Mercer County Traction Corp.,* 92 *Id.* 61. And several years later, in 1922, in the case of *Borough of Metuchen* v. *Board of Public Utility Commissioners and Public Service Railway Co.,* Mr. Justice Swayze, for the Supreme Court, sustained on *certiorari* (without opinion) an order of the Utility Commission granting to the railway company leave to abandon "its tracks and service" on one of the streets of the municipality.

Moreover, section 18 of the original Public Utility Act (*Pamph. L.* 1911, *p.* 380; *R. S.* 1937, 48:3-3) directs that no public utility "shall provide or maintain any service that is unsafe, improper or inadequate, or withhold or refuse any service which reasonably can be demanded or furnished when ordered" by the Utility Commission. And by a supplement to the Public Utility Act enacted on March 11th, 1924 (*Pamph. L.* 1924, *p.* 378; *R. S.* 1937, 48:2-24), it was provided that "if any public utility * * * shall discontinue service," and the Utility Commission "after hearing upon notice shall find and determine that service should be resumed," it "may order that service be resumed forthwith or on such date as" it may fix. Thus the utility is expressly authorized to "discontinue service" subject to the authority of the administrative agency to order its resumption if that course reasonably be in the public interest. And it is of no importance that the consent of this regulatory body is invoked by petition before the contemplated action is taken. That is a mere matter of procedure not at all concerned with the substance of the power. This course has been termed "a method more polite or more politic as we choose to call it." *O'Brien* v. *Public Utility Board,* 92 *N. J. L.* 44.

The failure of the legislature since to exercise its amendatory function is significant of its acquiescence in the interpretation thus given to these jurisdictional clauses. *DiMeglio* v. *Slonk Construction Co.,* 121 *N. J. L.* 366; *affirmed,* 122 *Id.* 379. It is the settled rule that whenever the meaning of

a statute is ambiguous, "the contemporaneous and long continued exposition exhibited in the usage and practice under it requires the construction thus put upon it to be accepted by the courts as the true one." *Commonwealth Roofing Co.* v. *Riccio,* 81 *N. J. Eq.* 486. The Utility Commission has time and again over the years exercised, apparently without question, the authority here challenged; and, with knowledge of this judicial and administrative construction, these provisions were re-enacted without substantial alteration in the revision of our general public laws adopted in 1937. Such judicial and administrative construction must be deemed to have received legislative approval by the re-enactment of the statutory provisions without material change. *Central Railroad Co.* v. *Thayer Martin,* 114 *N. J. L.* 69, 79; *United States* v. *Dakota-Montana Oil Co.,* 288 *U. S.* 459; 53 *S. Ct.* 435; 77 *L. Ed.* 893; *Massachusetts Mutual Life Insurance Co.* v. *United States,* 288 *U. S.* 269; 53 *S. Ct.* 337; 77 *L. Ed.* 739; *New York, New Haven and Hartford Railroad Co.* v. *Interstate Commerce Commission,* 200 *U. S.* 361, 401; 26 *S. Ct.* 272; 50 *L. Ed.* 515.

It is fairly to be presumed that the legislature purposed to commit to its administrative agency a broad discretion in the superintendence of utilities, guided by the standard of public necessity and convenience, and thus to safeguard them against an arbitrary and unreasonable exercise of the regulatory power. It was no doubt considered that the compulsory performance, at great loss to the utility, of that which does not substantially serve public necessity or convenience, merely because the duty was undertaken in consideration of the grant of the franchise, would be violative of sound principles of economy and inimical to the public interest, and a disregard also, depending upon the circumstances, of the constitutional guarantees of the right of property; and that relief from the obligation of wasteful service in the individual case should be the province of the body created to administer the legislative policy. *Vide Colorada* v. *United States,* 271 *U. S.* 153; 46 *S. Ct.* 452; 70 *L. Ed.* 878; *Brooks-Scanlon Co.* v. *Railroad Commission,* 251 *U. S.* 396; 40 *S. Ct.* 183; 64 *L. Ed.* 323; *Mississippi Railroad Com.*

v. *Mobile and O. Railroad Co.*, 244 *U. S.* 388; 37 *S. Ct.* 602; 61 *L. Ed.* 1216. The public has an interest in the use of the railroad; and it is axiomatic that that interest is prejudicially affected if such compulsory service would in the particular circumstances reduce the company's financial resources and necessitate an increase of rates to enable it to function in its *quasi*-public capacity with a fair degree of efficiency. Certainly, jurisdiction to order resumption of a discontinued service if reasonably grounded in public necessity and convenience connotes authority to sanction the discontinuance of a service when the need, so measured, no longer exists.

The prevailing view is that the power of general supervision and regulation of service necessarily includes authority to permit public utilities "to abandon service." *Railway Commission* v. *Macon Railway and Light Co.*, 151 *Ga.* 256; 106 *S. E. Rep.* 282. The Utility Commission is not confined to the powers expressly granted; it possesses also those arising from necessity or fair implication.

The order of the Utility Commission granted the application to "abandon service" on the branches in question; and appellant distinguishes between "abandonment" and "discontinuance." The order is read as permitting an abandonment irrevocable by the Commission. So that there may be no doubt as to the legal effect of the order, I would modify it to permit a discontinuance of the service subject to the continuing authority of the Commission to direct its resumption when essential to the service of public necessity and convenience.

My conclusion, therefore, is that the order under review, as so modified, should be affirmed.

Mr. Justice Colie and Judge Wells join in this opinion.

*For reversal*—The Chancellor, Chief Justice, Parker, Case, Donges, Dear, Rafferty, Hague, Thompson, JJ.  9.

*For modification and affirmance*—Heher, Colie, Wells, JJ.  3.