[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 272 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 273 
This is an appeal from an order of the Board of Public Utility Commissioners which, in primary effect, allocated the disputed Smoke Rise section of the Borough of Kinnelon for utility servicing by the electrical distribution plant of the Borough of Butler rather than the New Jersey Power and Light Company.
In 1915 the Borough of Butler began operating its own plant for the generation and distribution of electricity. It supplied electricity to its own residents and in the following year began supplying electricity to residents in the adjacent community of Bloomingdale. In 1925, it contracted with the *Page 274 
Jersey Central Power and Light Company for the purchase of electricity for distribution through Butler's facilities. Shortly thereafter, Butler ceased operating its generating plant but continued its distribution facilities through which it supplied electricity purchased from the Jersey Central Power and Light Company. In 1926, Butler began furnishing electricity to residents of the neighboring Borough of Kinnelon and an ordinance was duly adopted by Kinnelon authorizing Butler's extension of its electrical distribution system and its erection of poles, wires, and other appurtenances on public streets within the territorial limits of Kinnelon.
When it originally entered Kinnelon, Butler's services were limited to twenty-seven consumers. Thereafter, it expanded from time to time until in 1947 it serviced 476 consumers in Kinnelon. In 1933, at the request and expense of Morris Kinney, owner of a tract of 4,800 acres in Kinnelon, a line was extended to his homestead and outbuildings and Butler has supplied electricity to those premises since that time. Upon Mr. Kinney's death, the property was devised to Mr. J. Alden Talbot who occupies the homestead and has transferred 1,600 of the 4,800 acres to The Smoke Rise Company, Inc., which he organized for development purposes. Most of the acreage is rocky, wooded terrain and about fifty acres have been cleared. Although Smoke Rise was organized in 1946, its sales did not begin until May, 1947. Between May, 1947, and December, 1948, nineteen houses were completed and four others were under construction. In October, 1947, the first house was completed and occupied.
A representative of Smoke Rise testified that in March, 1947, he conferred with Mayor Mace of Butler and Mr. Chaudoin, whom he described as chairman of its electric committee, for the purpose of advising them of the plans for developing Smoke Rise and inquiring whether Butler would be interested in servicing Smoke Rise. He states that following this conference he heard nothing further from the Butler officials. However, Mayor Mace and Mr. Chaudoin testified that they were never requested to service Smoke Rise and *Page 275 
that, on the contrary, its representative had conferred with them to advise that it had made arrangements with one of the utility companies whose rates were cheaper than Butler's to supply the needed electricity. They further testified that they expressly advised the Smoke Rise representative that Butler had "jurisdiction" to supply the Smoke Rise area and would not waive it.
Thereafter, Smoke Rise entered a servicing agreement with New Jersey Power Light Company. Smoke Rise installed the necessary poles and lines at a cost of over $16,000 and is to be reimbursed by the Power Company. The lines constructed by Smoke Rise have been connected with the Power Company's distribution system which is located nearby and the Power Company has spent $3,253.25 connecting its main lines with the Smoke Rise development's facilities.
In September, 1947, Butler filed a petition with the Board of Public Utility Commissioners, which named the New Jersey Power 
Light Company, as respondent, and which sought a determination of the dispute as to servicing the Smoke Rise area pursuant toR.S. 48:7-5, which reads as follows:
"The board of public utility commissioners shall have power, after hearing, upon notice, to determine between public utilities supplying electric light, heat or power, questions in dispute as to territories to be served. Pending the hearing the board may enjoin the construction of facilities for such supply.
"Upon finding and determination that the construction is not necessary and proper for the public convenience and will not properly conserve the public interest, the board may issue orders prohibiting it."
Smoke Rise and Mr. Talbot were permitted to intervene and motions were made to dismiss the petition. An amended petition was filed, and after motion to dismiss the amended petition was denied without prejudice, the matter proceeded to full hearing. At the hearing, the Borough of Kinnelon supported Butler's position pursuant to a formal resolution, adopted on September 18, 1947, by the borough's mayor and council. The evidence does not permit dispute of the fact that the services actually rendered by Butler in Kinnelon from 1926 to date had been entirely adequate and acceptable *Page 276 
to the residents and officials of Kinnelon. Indeed, the intervener Talbot testified that during the ice storm, at the close of 1947, his home in the Smoke Rise area, serviced by Butler, was out of service for two periods, one of five hours and one of three hours, whereas the homes serviced by the New Jersey Power Light Company were out of service for one to two days. Homes serviced by the Power Company in areas other than Smoke Rise were out of service for as much as twelve days.
There is considerable testimony to establish that the Power Company's facilities and equipment far exceed Butler's. In gross, that cannot be questioned. Its total investment approximates $27,000,000 whereas Butler's investment is $450,000. It has many more maintenance or repair personnel than Butler has and its available equipment is superior. However, its aggregate service obligations are far greater than Butler's and the admitted fact is that Butler's force and facilities have been sufficient to enable it to meet its needs and render satisfactory service to its consumers.
In contrast to the New Jersey Power Light Company's use of its own generating facilities, Butler has been relying upon its arrangement with Jersey Central Power and Light Company for the furnishing of electrical energy to be distributed through Butler's plant. The present contract between Jersey Central and Butler will continue until 1951 and at Butler's option until 1956. The contract provides that Butler "may take electricity hereunder at any rate up to but not exceeding 1000 kilowatt amperes." Butler has been exceeding this amount and if it is to service additional consumers it will, unless it obtains new plant facilities which are only in the discussion stage, be obliged to negotiate further with Jersey Central to meet the additional requirements. However, the evidence indicates that Butler and Jersey Central have maintained consistently cordial relations since 1925 and have satisfactorily negotiated for changes in their contractual arrangement to meet increased needs as they arose. There is nothing in the record which suggests any change in their relations or difficulty in this regard. Under the contract *Page 277 
between Jersey Central and Butler, it is agreed that, except as specified therein, Jersey Central will not supply electrical energy in territory serviced by Butler. With the consent of Butler, Jersey Central has been servicing two industrial plants in Butler and a very small section of Kinnelon.
 1.
Appellant's first contention is that since Butler has serviced Kinnelon since 1926 without first having obtained approval from the Board of Public Utility Commissioners, as provided in R.S.
40:62-21, it has no standing to maintain its petition as a public utility within the contemplation of R.S. 48:7-5. The Board found that under R.S. 40:62-23 Butler was a public utility when it entered Kinnelon and thereafter; in addition, the Board, pursuant to a request in Butler's amended petition, formally entered its approval of the acts, contracts, and service of Butler in supplying electricity in Kinnelon. We agree that Butler was a public utility and find that the Board's formal approval of Butler's servicing in Kinnelon was within the proper exercise of its jurisdiction.
It is not disputed that Butler's activity in 1915 and 1916 in servicing consumers in Butler and Bloomingdale was pursuant to statutory authority. See P.L. 1897, c. 161, p. 300. The Home Rule Act, adopted in 1917 (P.L. 1917, c. 152, p. 445), provided that, subject to the approval of the Board of Public Utility Commissioners, any municipality operating a plant for supplying light, heat or power might enter into a contract with an adjoining municipality to supply electricity. See R.S.
40:62-21. The same act provided (see R.S. 40:62-24) that "Every municipality in supplying electricity, gas, steam or other product beyond its corporate limits is hereby declared to be a public utility." It is conceded that the pre-existing authority of Butler to continue its operations in Butler and Bloomingdale was not reduced by the Home Rule Act (see R.S. 40:42-3) and, to that extent, Butler was a public utility under R.S. 40:62-24. Appellants *Page 278 
contend, nevertheless, that it was a public utility only in so far as Butler and Bloomingdale were concerned and did not become a public utility in Kinnelon when it began servicing that borough in 1926 without having first obtained formal approval from the Board. Nothing in the statutory language supports this restrictive interpretation and we do not consider it sound. In 1926 Butler was a public utility under the unqualified terms ofR.S. 40:62-24. In expanding its activities to Kinnelon without first obtaining formal approval, it may have violated the law and subjected itself to pertinent statutory consequences, but such violation would not deprive it of its public utility status in Kinnelon any more than would violation by a utility company of restrictions imposed by law deprive it, without more, of its general utility status. Accordingly, we find, as did the Board, that Butler's petition was properly maintainable under R.S.
48:7-5 since the dispute between Butler and New Jersey Power 
Light Company as to territory to be served was one "between public utilities."
The evidence discloses that annual reports have been filed by Butler with the Board and that these reports referred to Butler's operations in Butler, Bloomingdale and Kinnelon; in 1920 and 1921 the Board approved extension of Butler's electric plant and its issuance of bonds; from time to time, Butler received communications from the Board which related to its utility operations, including those in Kinnelon; in 1930 Butler filed amended rates, applicable to Kinnelon, which were the subject of a report by the Board's Chief Inspector of the Bureau of Utilities; in 1938 and 1939, Butler received communications from the Board relating to its service in Kinnelon; and, in general, it is evident, as the Board found, that for over 30 years "the Board has exercised jurisdiction over Butler's electric light department." Under the circumstances, the entry of formal approval by the Board of Butler's activities in Kinnelon was a fair and equitable exercise of the Board's judgment. Cf. EastJersey Water Co. v. Board of Public Utility Commissioners,98 N.J.L. 449, 454 (E. A. 1923). We do not consider that the objection urged by the appellants, namely, that the approval should not *Page 279 
have been entered in a proceeding under R.S. 48:7-5, but should have been the subject of a separate proceeding under R.S.
40:62-21 and R.S. 40:62-23, upon notice to Jersey Central as well as New Jersey Power Light Company, has any merit. Nothing in the statute requires such separation of proceedings and the appellants are in no position to assert any lack of notification to Jersey Central which, although not a party, had actual notice of the proceeding.
 2.
The second contention urged by the New Jersey Power Light Company is that "the decision and order of the Board is arbitrary and capricious and is not supported by the facts." This contention recognizes the well settled rule that in reviewing a determination by the Board of Public Utility Commissioners, such as that under consideration, the court will not substitute its judgment for the Board's but will confine its inquiry to an ascertainment of whether the evidence before the Board furnished a reasonable basis for its determination; if it did, then the Board's action is to be sustained. See Rahway Valley Railway Co.v. Board of Public Utility Commissioners, 127 N.J.L. 164, 167
(Sup. Ct. 1941).
R.S. 48:7-5 vests in the Board jurisdiction to decide disputes between public utilities as to territories to be served and authorizes the Board to prohibit construction by a utility where it is not "necessary and proper for the public convenience and will not properly conserve the public interest." In the instant case the Board concluded that the disputed Smoke Rise area should be serviced by Butler rather than New Jersey Power 
Light Company and that construction therein by the Power Company was not necessary for the public convenience and would not properly conserve the public interest. In reaching its conclusion the Board referred particularly to the fact that Butler had entered Kinnelon at the request of the mayor and council of Kinnelon in 1926 when "no other existing public utility or company was serving that territory — adequately, properly or otherwise;" that when Butler *Page 280 
first entered the Smoke Rise area in 1933, it was not being "adequately and properly served by an existing company;" and that Butler has "rendered reasonably safe, adequate and sufficient service in Kinnelon since 1926." In reaching its determination as to what action was dictated by public convenience and public interest, the Board was not confined to the narrow issue of which utility, at the moment, had the better equipment and facilities to service the homes in Smoke Rise, but was at liberty to consider, as it did, the pioneering activities of Butler in the area, the interests of the consumers in Kinnelon and the other nearby territories serviced by Butler, and other factors which, in the light of the Board's experience, were relevant. SeeFornarotto v. Board of Public Utility Commissioners,105 N.J.L. 28, 34 (Sup. Ct. 1928).
The appellants point out that Butler's rates are higher than those of the New Jersey Power Light Company. In its amended petition, Butler asserted that it had reduced its rates effective January 1, 1948, and that said "reduction is based upon the increased potential customers to be had in the Borough of Kinnelon." The reduced rates are still higher than the Power Company's although there is no suggestion that Butler's rates are unreasonable. The Board found that the differential in rates was not controlling since it depended on future developments and if, at any time, the rates were thought to be unreasonable, application for reduction could be made to the Board. In Butler's brief it was represented, without contradiction, that since the hearing before the Board the Power Company had made application for an increase in rates. Although we consider that the differential in rates was a proper factor for the Board's consideration, we agree with its conclusion that it was not controlling.
While we recognize the limitations of the facilities of Butler, in contrast to those of the Power Company, we are unable to conclude that there was no reasonable support for the Board's conclusion that the Smoke Rise area should be serviced by Butler rather than the Power Company and that public convenience and the public interest required prohibition of construction in that area by the Power Company. The *Page 281 
settlement of such disputes was expressly left to the Board's expert determination and considering the relevant factors in the light of the evidence that since 1915 Butler has satisfactorily operated without interruption, that it has adequately met increased needs as they arose from time to time, that it entered Kinnelon in 1926 when no other utility company serviced the borough, and rendered service to the satisfaction of residents and officials of the borough, that it entered the Smoke Rise area of Kinnelon as early as 1933 and properly serviced the homestead originally owned by Mr. Kinney and now by the intervener Talbo, and that during the recent disruption of facilities its service was better than the Power Company's, we cannot say that the Board's determination as to where public convenience and the public interest lie was arbitrary or had no reasonable basis.
 3.
The third contention urged by the New Jersey Power Light Company is that the Board "was without jurisdiction to order the sale" of its facilities to Butler. We do not consider that the Board's decision and order compels such sale. In the concluding paragraph of its decision the Board stated that "it would appear entirely reasonable to require Butler to undertake certain commitments to reimburse respondent and interveners for such poles, lines and facilities already installed and which will be used by Butler in servicing its new customers in the Smoke Rise development." In its order the Board directed that Butler, the Power Company, and Smoke Rise, Inc., enter upon negotiations "to effect a just, equitable and mutually agreeable settlement and adjustment with respect to moneys expended by New Jersey Power 
Light Company and Smoke Rise, Inc., on poles, lines, and facilities which will be used by the Borough of Butler in supplying electricity to customers in the Smoke Rise area of the Borough of Kinnelon." It seems to us that the intent of the foregoing was to compel Butler to make a reasonable offer for the facilities which have been erected and thus avoid unnecessary *Page 282 
loss to the appellants. In its brief and at the argument Butler voiced no objection and expressed its willingness to proceed with negotiations. Nothing in the Board's decision and order compels the appellants to sell their equipment except upon their terms, and, in the event they decline to make any sale, nothing in the decision and order imposes any burden or penalty upon them. Under these circumstances appellants are not harmed and are in no position to complain.
 4.
The final contention advanced by the appellants is that the decision and order of the Board deprived them of their property in violation of the Fourteenth Amendment of the Constitution of the United States and that an independent finding of fact should be made by this court, citing New Jersey Suburban Water Co. v.Board of Public Utility Commissioners, 123 N.J.L. 303 (E. A. 1939); certiorari denied, sub nom. McGregor, Recv'r v.Board of Public Utility Comm., 309 U.S. 663, 84 L.Ed. 1010
(1940). There the court, in a rate case, restated the doctrine that where the contention is that the Board's action is confiscatory, in violation of the Fourteenth Amendment, an independent finding of fact will be made by the court to satisfy the requirements of due process. That doctrine has no application, where, as here, the matter presented is a dispute between utilities with respect to territories to be served, which is submitted to the Board for determination in accordance with statutory authority and does not affect, except perhaps incidentally, property or contractual rights. Cf. Eastern NewJersey Power Co. v. Board of Public Utility Commissioners,6 N.J. Misc. 118 (Sup. Ct. 1928).
The order of the Board of Public Utility Commissioners is affirmed. *Page 283