23 N.J. Super. 1 (1952)
92 A.2d 515
IN THE MATTER OF THE PROPOSAL OF THE NEW JERSEY AND NEW YORK RAILROAD COMPANY TO DISCONTINUE THE OPERATION OF TRAIN NUMBER 613.
Superior Court of New Jersey, Appellate Division.
Argued October 14, 1952.
Decided November 18, 1952.
*2 Before Judges FREUND, STANTON and CONLON.
*3 Mr. Justin W. Seymour argued the cause for the appellant (Messrs. Seymour & Seymour, attorneys for Peter Duryea, trustee of the property of the New Jersey and New York Railroad Company).
Mr. Maurice A. Walsh argued the cause for the respondents (Messrs. Fahy & Walsh, attorneys for the Borough of Park Ridge, Montvale, Oradell and River Edge).
Mr. Sam A. Colarusso argued the cause for the Brotherhood of Railroad Trainmen.
The opinion of the court was delivered by CONLON, J.C.C. (temporarily assigned).
Peter Duryea, trustee of the property of the New Jersey and New York Railroad Company (hereinafter referred to as the Railroad) appeals from an order of the Board of Public Utilities Commissioners dated March 5, 1952, denying permission to discontinue the operation of the westbound evening train number 613 which leaves Jersey City at 4:45 P.M. daily except Saturdays, Sundays and holidays.
The operation of the train has had prior consideration by the utility board. On November 9, 1950, on application of the Railroad, the board permitted it to discontinue the operation of Train number 632, which was a non-passenger train operating as the return (eastbound) movement of Train number 613, and, without prejudice, denied permission to discontinue Train number 613. An application for a rehearing was denied on May 17, 1951. The present application was instituted by a letter of the Railroad dated June 20, 1951.
The Railroad extends in a northerly direction from a connection with the Erie Railroad 1.3 miles south of Carlstadt to Spring Valley, New York, a distance of 23.2 miles. It owns no rolling stock or motive power, and under an agreement with the Erie Railroad the latter's equipment is operated between Jersey City and Spring Valley, a distance of 30.7 *4 miles, i.e., 7.5 miles over the main line of the Erie and 23.2 miles over its own line. It has been in reorganization since June 30, 1938 under section 77 of the Bankruptcy Act, until 1941 in the District Court for the Northern District of Ohio and since then in the District Court for the District of New Jersey.
The Railroad contends on this appeal that the finding of the utilities board was erroneous in two respects, one as to the law and the other as to the facts. Its first contention is that since its entire operation is being conducted at a loss, the requirement that it continue the operation of a train which is unprofitable and which contributes heavily to that loss is unreasonable and confiscatory. It thus projects the contention that where the entire operation of a railroad is carried on at a loss, it has the right to discontinue a train which is itself unprofitable without regard to the element of public convenience and necessity, and it argues that a contrary conclusion would be an invasion of its constitutional rights in that the enforced operation of the train would constitute confiscation of its property without due process. Many cases are cited in support of the proposition. Railroad Commission of Texas v. Eastern Texas Railroad, 264 U.S. 79, 44 S.Ct. 247, 68 L.Ed. 569 (1924); Bullock v. Florida ex rel. Railroad Commission of Florida, 254 U.S. 513, 41 S.Ct. 193, 65 L.Ed. 380 (1921); Brooks-Scanlon Co. v. Railroad Commission of Louisiana, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323 (1920); Mississippi Railroad Commission v. Mobile & Ohio R.R., 244 U.S. 388, 37 S.Ct. 602, 61 L.Ed. 1216 (1917); Crawford v. Duluth St. Ry. Co., 60 F.2d 212 (C.C.A. 7 1932); State of Iowa v. Old Colony Trust Co., 215 F. 307, 312, L.R.A. 1915 A, 549 (C.C.A. 8 1914). A review of these cases discloses that none of them bears out the appellant's contention. Most of them present situations in which the railroad was seeking the discontinuance of an unprofitable branch line. The others are cases in which the degree of public convenience and necessity was weighed against the financial loss to the railroad.
*5 The appellant also urges as authority the decision in Pennsylvania-Reading Seashore Lines v. Board of Public Utility Commissioners, 5 N.J. 114 (1950). In that case the railroad applied to discontinue the operation of two trains, one running in each direction between Woodbury and Penns Grove, a branch line of the railroad. They were the only passenger trains operated by the railroad on the branch and apparently had been kept running so that the road might not subject itself to the forfeiture of its franchise, it appearing that the branch conducted a profitable frieght business. The trains carried five or six passengers each, and the utility board made a factual finding to the effect that public convenience and necessity did not require their continuance, but declined to order their abandonment under the principle established in O'Connor v. Board of Public Utility Commissioners, 129 N.J.L. 263 (E. & A. 1942), which held that the railroad by reason of its franchise had a contractual obligation to the State to operate some passenger service and the utility board was without jurisdiction to erase this obligation from the railroad's agreement. In reversing the O'Connor case, speaking for the court, Chief Justice Vanderbilt held:
"It was specifically found by the Board after a public hearing on due notice that the continued operation of such service was not required by public necessity or convenience. Its order was founded solely on the ground that the decision in the O'Connor case left the Board without discretion; that under the statutes as there construed it was mandatory for the railroad to continue to operate passenger trains, even though such operation was entirely unnecessary and could only be carried on at a continued and substantial loss. If the situation were such that the branch line was serving a real public need of passengers or the railroad as a whole was making a profit although this particular branch was operating at a loss, the problem would be an entirely different one; in either of these events, to order the railroad to continue service might not be arbitrary and unreasonable in view of all the circumstances. But here the branch line serves no public need for passenger service and not only the branch line but the entire railroad has been operating at a loss for a considerable number of years."
This determination is not applicable to the present situation. In the first place, there was found a complete lack of *6 the element of public convenience and necessity, and further than that there was involved the discontinuance of all of the passenger service on a branch line. Here there is involved the discontinuance of a single train on the Railroad's main and only line. This latter distinction has far deeper implications than might at first seem apparent.
If the application here were to discontinue all passenger service on the ground that the entire operation of the Railroad was unprofitable, it seems that it would become incumbent on the utility board to examine into all of the financial affairs of the Railroad, particularly that phase of them which relates to its contractual relationship with the Erie Railroad and the reasonableness of the rental and other charges paid under the agreement with the Erie. It might well also examine into the degree of control which the Erie exercises by reason of the ownership of most of its stock. No such inquiries were made or required for the purpose of the present application.
To extend the principle that the utility board may permit the suspension of all of the passenger service of an entire line on the sole ground that it is operating at a loss to a determination that the board must permit the discontinuance of a single train on the sole ground that the train is unprofitable and the Railroad is operating at a loss would create an anomalous situation. The result would be that any railroad could as a matter of right discontinue any unprofitable train if its entire operation showed a loss. Hence the appellant would be empowered, if this application were granted on the ground urged, to discontinue any other unprofitable trains it chose and confine its operation only to profitable trains, at the same time ignoring all aspects of the public convenience and necessity involved.
The record before us indicates that without giving consideration to the reasonableness of the terms of the agreement between the Erie Railroad and the appellant, for the year 1951 the Railroad sustained a net passenger railway operating loss of $218,709 and had a net freight operating income *7 of $53,406, leaving a net railway operating loss of $165,303. The annual out-of-pocket loss involved in the operation of Train number 613 is about $34,000. Obviously, the discontinuance of the train in question, while it will reduce the operating loss by some 20%, will fall far short of removing the Railroad's net operating loss. It may be presumed that if this court were to hold under the circumstances here presented that the Railroad has, as it contends it has, the right to discontinue any unprofitable train, it would proceed to discontinue other unprofitable trains by mere notice to the utility board, which would perforce be compelled to concur in the discontinuance without being able to give consideration to any of the other elements that are generally recognized as being material to the maintenance of service in accord with the public convenience and necessity. Thus the utility board would be shorn of the power and obligation delegated to it by the Legislature to regulate service in the public interest. The adoption of the novel principle urged by the appellant would, in effect, result in the assumption by the court of the regulatory obligations of the utility board. The denial of the application by the utility board on this ground was proper.
The Railroad is not without remedies to preserve its constitutional rights. If its operation is so financially unsound as to require either a discontinuance of all service or a material revamping of its timetable with a view of curtailing out-of-pocket losses which it cannot absorb indefinitely, it may be that an entirely new plan of operation should be presented so that the utility board may consider it in accordance with its regulatory obligations.
The Railroad further contends that under the proofs submitted the public convenience and necessity do not warrant the board in refusing to permit the discontinuance of the train in question. In the resolution of that contention it is proper to take into consideration both the out-of-pocket loss incident to the operation of the train and the degree of public convenience and necessity involved. But *8 in weighing the relative importance of out-of-pocket loss and public convenience and necessity, this court is bound by the principle that it was the duty of the board to give primary consideration to the latter. Colorado v. United States, 271 U.S. 153, at pages 162 and 168, 46 S.Ct. 452, 70 L.Ed. 878 (1926). Furthermore, consideration must be given to the fact that the utility board is a quasi-judicial agency for which reason if, after due hearing, it passes upon a question of fact within its jurisdiction and with the determination of which it is charged by statute, its findings are not to be reversed unless unwarranted in law or unfounded in fact, or unless a discretionary power has been plainly abused. Rahway Valley R.R. Co. v. Board of Public Utility Commissioners, 127 N.J.L. 164 (Sup. Ct. 1941); N.J. Power & Light Co. v. Butler, 4 N.J. Super. 270 (App. Div. 1949).
On the question of public convenience and necessity, the facts found by the board do not differ materially from the contentions of the appellant. It appears that Train No. 613 leaves Jersey City at 4:45 P.M. and arrives at its terminus at Spring Valley at 6:07 P.M. It makes 20 intermediate stops and is the only train giving comparable service between 2:13 P.M. and 5:13 P.M. It carries about 144 fare-paying passengers per day. The monthly revenue derived from handling passengers, newspapers, mail and express amounts to approximately $1,351. Without giving consideration to the reasonableness of the rental and other charges imposed by the Erie Railroad, the out-of-pocket cost of operating the train averages about $4,204 a month, so that the revenue, according to the company's figures, is some $2,853 per month less than the out-of-pocket expense. However, an analysis by the board of the company's passenger count indicates that the number of passengers carried in 1951 showed a monthly average of 4,650 as against 4,123 in 1950, or an increase of about 13%.
The railroad suggests that the passengers who presently use Train No. 613 could be accommodated on Train No. 615 *9 which leaves Jersey City 28 minutes later and would be speeded up so as to make a somewhat faster trip. It also points out that parallel bus service is available.
No formula can be devised to determine how many passengers are necessary to establish whether or not the operation of a particular train is within the bounds of public convenience and necessity. In this case the board determined that the number was sufficient. It arrived at that determination in accordance with its legislative obligation to consider not only the convenience and necessity of the public but the welfare of the Railroad itself. The determination of the utility board is not so in conflict with the evidence as to warrant this court to override it as being unreasonable and unjust.
The order of the Board of Public Utility Commissioners is affirmed.