ATLANTIC COAST ELECTRIC RAILWAY COMPANY, RE-SPONDENT, v. BOARD OF PUBLIC UTILITY COMMIS-SIONERS AND BRADLEY BEACH, APPELLANTS.

Argued March 12, 1918—Decided June 17, 1918.

1. The senate and general assembly in whom by our constitution the legislative power is vested, must necessarily, as the repre-sentative of all the people of the state, be held to retain all the sovereign powers, except as far as they have by unmistakable language intrusted them to others.
2. The traction acts of 1893 and 1896 do not expressly authorize municipalities to contract with street railway companies. The power is implied from the power to grant or refuse consent to a location of tracks, and to impose lawful restrictions; the implication of power ought not to be extended beyond the neces-sities of the case.
3. Full effect can be given to the language of the traction acts of 1893 and 1896 by holding that the force and effect of a contract under section 32 of the act of 1893 is the force and effect of a contract by which the municipality and the railway company—the only parties thereto—are bound, but that no restriction is thereby implied on the sovereign power of the state to fix just and reasonable rates as subsequent conditions may make de-sirable.
4. The power of a municipality to impose lawful restrictions upon granting consent to the location of tracks of a street railway, is subject to the condition that they be reasonable.
5. The lawful restrictions that may be imposed upon granting con-sent to the location of tracks of a street railway, must be lawful not only at the time, but from time to time, that is at all times.
6. The order of the board of public utility commissioners in the present case is justified by the Public Utilities act of 1911.

On appeal from the Supreme Court, whose opinion is re-ported in 89 *N. J. L.* 407.

For the prosecutor, *Robert H. McCarter* (*Durand, Ivins & Carton* on the brief).

For the public utility commissioners, *L. Edward Herrmann.*

For the borough of Bradley Beach, *Ward Kremer.*

The opinion of the court was delivered by

Swayze, J.   The question is whether the ordinance of Bradley Beach and its acceptance by the street railway company made a contract which the State of New Jersey could not thereafter control, for unless the state was deprived of its control by the act of the municipality, the board of public utility commissioners is free to act under authority of the act of 1911 by which it was created. The grant of power is strictly construed in favor of the state just as all grants of corporate power are strictly construed. *Meday* v. *Rutherford,* 65 *N. J. L.* 645. The senate and general assembly, in whom by our constitution the legislative power is vested, must necessarily as the representative of all the people of the state be held to retain all sovereign powers, except as far as they have by unmistakable language intrusted them to others. Our constitution does not, like the constitutions of some states, confer upon municipalities the right to grant street franchises. We have been careful to keep the sovereignty of the state unimpaired and have not parceled out the sovereign powers among minor political subdivisions. Municipalities with us act solely by virtue of legislative authority and as legislative agents. The legislature may intrust to municipal corporations, or even, as in the case of eminent domain, to private corporations, certain powers, and may even authorize them to make irrepealable contracts, but the courts ought to be, as they have been, astute to see that such powers are not unnecessarily extended by implication.

The powers of municipalities in the granting of franchises to street railways are to be found in the Traction act of 1893

(*Comp. Stat., p.* 5021), and the act of 1896 (*Comp. Stat., p.* 5040). They are limited to giving consent to the construction, operation and maintenance of the street railway, the location of tracks, and imposing lawful restrictions.

The peculiar language of the acts is noteworthy. They nowhere expressly authorize the municipality to contract; they nowhere declare that the consent and acceptance constitute a contract. Section 32 merely declares that the consent and acceptance shall have the "force and effect" of a contract. This language would be unnecessary if the consent and acceptance were in fact a contract, in the full sense of the word, for a contract necessarily has such force and effect. It must be because the consent and acceptance are in the nature of municipal legislation rather than of private agreement that the legislature thought it necessary to add that they should have the *force and effect* of a contract. We must indeed attribute to the words all the meaning that the legislature meant to attach thereto, but the question is what force and effect was meant since they are clearly subject to some limitation. The consent and acceptance are surely subject to the taxing power and the police power of the state. No one would suggest that the power to consent and impose lawful restrictions upon the street railway company could be so exercised as to deprive the state government of its general control over the highways in which the rails are laid, including the power to vacate, to regulate speed of vehicles, to enact a law of the road, to give fire apparatus the right of way, to transfer control to county boards or to the state instead of the municipality, and to determine as to other matters of police. *Northern Pacific Railway* v. *Duluth,* 208 *U. S.* 583, and cases there cited. So also it is quite inconceivable that the municipality could by its ordinance granting consent make provisions that would limit the taxing power of the state, whether by granting exemption from local taxes or by special contract as to amount or method of assessment. To that extent surely the ordinance could not have the force and effect of a contract. To what extent does

the ordinance limit the other sovereign power of controlling rates of public utility companies?

It is well settled that a power to fix rates may be delegated to the municipality and that rates so fixed may amount to an irrepealable contract binding future legislatures. The leading cases are cited by the Supreme Court. But as was said in *Home Telephone Co.* v. *Los Angeles,* 211 *U. S.* 265, 273, "For the very reason that such a contract has the effect of extinguishing *pro tanto* an undoubted power of government, both its existence and the authority to make it must clearly and unmistakably appear, and all doubts must be resolved in favor of the continuance of the power." In that case the city charter gave power to regulate telephone services and the use of telephones within the city and to fix and determine the charges for telephones and telephone service and connection. This, as the court said, is "ample authority to exercise the governmental power of regulating charges, but it is no authority to enter into a contract to abandon the governmental power itself. It speaks in words appropriate to describe the authority to excuse the governmental power, but entirely unfitted to describe the authority to contract. It authorizes command, but not agreement." And the court made a distinction between an ordinance "to fix and determine the charges," and an ordinance to "agree" upon the charges. In that case, the franchise had been sold by the municipality under statutory authority for a valuable consideration, and an ordinance had been passed granting the franchise and providing that the charges for service should not exceed specific amounts. Afterward the city passed an ordinance establishing lower rates. The later ordinance was held valid. Here the subsequent action was by municipal ordinance. In a later case, the subsequent action was by a state board. *Milwaukee Electric Railway* v. *Wisconsin R. R. Comm.,* 238 *U. S.* 174. In that case the power of the municipality under the act of the legislature was to "grant" the rights to street railways to use the streets upon such terms as the proper authorities should determine. The ordinance authorized the street railway company to charge a

fare not to exceed five cents and required the sale of twenty-five five-cent tickets for a dollar.   Later, an order of the Wisconsin Railroad Commission required the sale of thirteen tickets for fifty cents.   The order was held valid.   The opinions in these cases review the earlier precedents upon which our Supreme Court relied in the present case, and show that those precedents arose under an express power to contract or under statutes which ratified the municipal action and in effect made it the action of the legislature itself.   There is no such statute in New Jersey.   Since the ultimate decision in cases where a claim is made to an irrepealable contract must rest with the United States Supreme Court, we must follow their decisions.

There is, as we have already said, no express grant of power to the municipality to fix rates or to contract as to rates.   The power is implied from the power to grant or refuse consent to a location of tracks and to impose lawful restrictions.   *Jersey City and Hoboken Horse R. Co.* v. *Jersey City and Bergen R. Co.,* 21 *N. J. Eq.* 550; *Jersey City* v. *Jersey City and Bergen Railway Co.,* 70 *N. J. L.* 360. Neither in section 1 nor section 7 of the act of 1893, nor in the act of 1896, is there any mention of a contract, nor does the title of the ordinance granting consent indicate an intention to contract as to rates of fare, or even to impose lawful restrictions; it purports only to grant consent to the construction, operation and maintenance of a new line of street railway, a location of the route, and a location of the tracks and rails.   Since the power to contract as to fares is only an implied power, the implication ought not to be extended so as to restrict the sovereign power of the state unless we are compelled to that result by the necessity of giving meaning to the words "force and effect of a contract."   Such a result is not necessary.   Full effect can be given to the language by holding that the force and effect of a contract given by section 32 is the force and effect of a contract by which the municipality and the railway company—the only parties thereto—are bound, but that no restriction is thereby implied on the sovereign powers of the state, whether to fix

just and reasonable rates as subsequent conditions may make desirable, or to exercise the taxing power or the police power. As between the parties, the consent and acceptance have force and effect as a contract, as was held in *Reed* v. *Inhabitants of Trenton*, 80 *N. J. Eq.* 503, and in *Asbury Park Street Railroad Co.* v. *Township of Neptune*, 75 *Id.* 562; but it is a contract subject to the state's sovereign power over rates, and when as in this case, the state through its board of public utility commissioners exercises its sovereign power over rates, the contract rights of the parties must yield. This gives the municipal action the force and effect of a contract, but not the force and effect of an irrepealable contract.

Even the implied power of the municipality to contract is under the statute limited. It is implied from the power to impose restrictions, but the statute requires that the restrictions be lawful, and they must like all provisions of municipal ordinances be reasonable. *Rutherford* v. *Hudson River Traction Co.,* 73 *N. J. L.* 227. It would not be reasonable for a municipality without express power for the purpose to tie the hands of the state forever.

Not only must the restrictions be reasonable, they must be lawful. The word "lawful" may mean lawful at the time of the consent and acceptance, or lawful from time to time and at the time the controversy arises. If we adopt the former meaning, the word at the date of the ordinance in 1897, as applied to rates, meant just and reasonable rates as at common law, and that meant just and reasonable rates from time to time, as cost of service and other circumstances vary; the power to fix unchangeable or unreasonable rates could not be implied from the words "lawful restrictions." But it is the latter meaning that had become the settled one in the United States Supreme Court before 1897, the date of the ordinance now before us. In *Ruggles* v. *Illinois* (1883), 108 *U. S.* 526, the railroad company was authorized to pass by-laws regulating the affairs, business and interest of the company, provided they were not repugnant to the constitution and laws of the United States or the State of Illinois. Rates of fare had been fixed pursuant to the by-laws. The

174    COURT OF ERRORS AND APPEALS.

Atl. Coast Elec. Ry. Co. v. Public Utility Board.    *92 N. J. L.*

question arose in a case involving the legality of a passenger fare. The court said: "Clearly under this authority no by-law can be established by the directors that does not conform to the laws of the state, and this, whether the laws were in force when the amended charter was granted or came into operation afterward. The power of the company for the regulation of its own affairs was thus in express terms sub-jected to the legislative control of the state. The corporate power was a continuing one and intended for the ordering of the affairs of the company as circumstances might from time to time require. The reversed control by the state was also continuing in its nature, and manifestly intended for the protection of the public whenever in the judgment of the legislative department of the government the necessity should arise." This rule has been applied in the *Railroad Commission Cases* (1886), 116 *Id.* 307, and recently, in *Owensboro* v. *Owensboro Water Works Co.* (1903), 191 *Id.* 358, 370. In *Freeport Water Co.* v. *Freeport City* (1901), 180 *Id.* 587, 600, it was held that a statute authorizing a contract between a city and a water company for water at such rates "as may be fixed by ordinance," meant, "as may be fixed by ordinance from time to time," and not as may be fixed by ordinance at the date of the contract. In the most recent case it was held that a proviso that rules for the management and operation of lines of a street railway company "shall not conflict with the laws of the state," by fair construction means the laws as they shall from time to time exist. *Puget Sound Traction Co.* v. *Reynolds* (1917), 244 *Id.* 574. Following this rule of construction, the lawful restrictions authorized by the Trac-tion act of 1893 must be lawful from time to time, that is at all times, and hence at the present time; from which it fol-lows that they must not be in conflict with the Public Utility act of 1911.

We can test our result in another way. What was lawful in 1897 was just and reasonable rates and practices. It would be absurd to contend that the municipality and the railroad company, under the power to impose lawful restric-tions, could have fixed by their agreement unjust and un-

reasonable rates and practices; we must assume that the rates and practices then fixed were at the time just and reasonable. But it can hardly be that with changing circumstances those rates and practices would forever remain just and reasonable. We are admonished by present day conditions that the higher level of prices and wages may have made old rates unreasonably low, and the constant progress in invention and in business management may have made old practices unjust to the public. And if the rates become unreasonable and the practices unjust, they would cease to be lawful. Unchangeable rates and practices are almost certain to become unlawful. The legislature did not in this respect change the law by the Public Utilities act of 1911. That act only authorizes just and reasonable rates and practices. It puts into statutory form what was in 1897, and always has been, lawful, and intrusts the execution of the act to the new board. It follows that there is no impairment of the contract for lawful restrictions, which is all the Traction act authorizes.

To avoid possible misunderstanding we add what is probably plain enough, that our view does not affect contracts made by the legislature itself or by any individual or corporation which has power to make them. We are in this case dealing only with the extent of the power given to the municipality and we hold that the power is not broad enough to justify the municipality in restricting the sovereign power of the state over rates to be charged by public utilities.

It remains only to consider whether the Public Utility act of 1911 warrants the order made by the board. The scope of that act is very broad. It is evidently meant to give full control of all public utilities to the board thereby created, so far as it could be done by legislation. The board is given general supervision and regulation of and control over public utilities and over their property, property rights, equipment, facilities and franchises, so far as necessary to carry out the provisions of the act. The commission is given power, among others things, to fix just and reasonable rates, to fix just and reasonable standards, classifications, regulations, practices, measurements or service, to require railroads and street rail-

ways to establish and maintain just and reasonable connections with other lines. These powers are quite enough to justify the present order, whether it is regarded as a regulation of practices or fares. The judgment setting it aside must be reversed, with costs.

WHITE, J. (dissenting). I disagree with the view that the terms under which was granted the public franchise here involved, were at the same time both a contract and not a contract; that such contract while entered into by the municipality in pursuance of express legislative authority from the state to have "the force and effect of a contract," although a valid and binding contract between the parties to it, viz., between the municipality and the trolley company, is not such a contract as is protected by the federal and state constitutions. The municipality is a state agency, as is also the public utility commission. If the franchise restrictions were binding as a contract upon one agent they were as such equally binding upon the other, because they were binding upon the principal of both. Without authority from such principal to contract they were binding upon neither agent; with such authority they were binding upon the principal and consequently upon both agents. To concede that they were binding as a contract upon one agent is, it seems to me, to concede that they are binding upon the principal and upon both the agents.

It is suggested that this is not so because the subject-matter of the contract is subject to the state's sovereign police and taxing power. I think that the doctrine that contractual property rights which are subject to the state's police power and taxing power, and, I might add, to the power of eminent domain, are, because of this, not protected from confiscation, is both novel and unsound.

It is further said that the fact that the act provided that the restrictions imposed by the municipality if accepted by the trolley company should have the "force and effect of a contract," shows that they were not in fact a contract because if they were it would not have been necessary to give

them the force and effect of a contract. I take the contrary view. It seems to me that in order to invite the investment of capital in public transportation by giving it something definite to rely upon, and to negative the idea that the terms agreed upon were merely temporary regulations, subject to change from time to time at municipal or state legislative whim, the state authorized the municipality to put them in the shape of an inviolable contract.

Again, if it be true that these terms proposed by the municipality and accepted by the trolley company as to the rate of fare to be charged, do not constitute a contract, then they may be changed by the state or by any other of its duly authorized agencies without the consent of the municipality which exacted the terms for the protection of its own people traveling upon its own streets. If, on the contrary, they constitute a contract, it seems to me that contract was made by an agency of the state having, and recognized by the state at the time as having, an interest in the subject-matter of the contract, and that therefore, under the well recognized rule as to other agents, the contract cannot be altered by the state without the consent of the interested municipality.

For the above reasons, and for those expressed in the opinion of Mr. Justice Trenchard, speaking for himself and for the Chief Justice and Mr. Justice Black, in the Supreme Court, with which reasons I agree, I vote to affirm the judgment of that court. I am requested by Chancellor Walker to say that he concurs in the foregoing views.

*For affirmance*—THE CHANCELLOR, WHITE, J.    2.

*For reversal*—SWAYZE, PARKER, BERGEN, KALISCH, HEPPENHEIMER, WILLIAMS, TAYLOR, JJ.    7.