WILLIAM H. O'CONNOR, EMMA G. ADAMSON AND T. EARLE REEVES, PROSECUTORS, v. BOARD OF PUBLIC UTILITY COMMISSIONERS AND PENNSYLVANIA-READING SEASHORE LINES, DEFENDANTS.

Argued January 20, 1942—Decided February 11, 1942.

36

Before Justices BODINE, PERSKIE and PORTER.

For the prosecutors, *Waddington & Tilton.*

For Board of Public Utility Commissioners, *John A. Bernhard.*

For Pennsylvania-Reading Seashore Lines, *French, Richards & Bradley* (*Floyd H. Bradley*) and *Grace Heritage Smith* (*H. Merle Mulloy* and *Windsor F. Cousins,* of the Philadelphia bar).

BODINE, J. This case presents two questions for decision. The first question is the power of the Board of Public Utility Commissioners to authorize a railroad company operating in this state to discontinue all passenger service. The second question is the reasonableness of the action taken in this case. The railroad voluntarily continued the service until May 20th of this year so that we might review the same. If the situation as to the passenger operation changes by reason of the national defense necessity, the road may be taken over or the Utility Board will act as it may be then advised. Nevertheless, we think the questions raised should be decided so that the board may know the extent of its power.

The General Railroad Act, *N. J. S. A.* 48:12-99, requires every railroad to run trains for the transportation of persons and property. This obligation, however, must be measured by public necessity and convenience. The argument to the contrary seems to be that the railroad must run passenger

trains at a terrific loss or abandon the franchise, even though the public may travel as easily and reasonably by other conveyances. There seems to be no reason why a railroad must supply transportation for a few passengers who are unwilling to ride in adequate buses paralleling the lines of operation.

Under date of July 23d, 1941, Mr. Ralph Budd, Transportation Commissioner of the Council of National Defense, warned all railroads that troop transportation in 1942 would exceed that of 1941 by 40 to 100 per cent.; that unnecessary trains should be discontinued and that there would be no priorities for further passenger equipment. Again he warned, in August of 1941, that there must be elimination of unnecessary competitive services.

If the argument be sound that there is no way for a railroad to discontinue an unnecessary service, except to forfeit its charter, then planning for national defense becomes ineffective and our efforts must be slowed down because of a few willful people who like to ride short distances in railroad trains.

This court cannot attribute such meaning to the pertinent legislative enactments. Vice-Chancellor Garrison in *Jacquelin* v. *Erie Railroad Co.*, 69 *N. J. Eq.* 432 (at *p.* 440), said: "The Supreme Court of the United States has suggested that this subject of the regulation of the operation of carriers, in the matter of stations, frequency of trains and the like, is one for legislation and administration, and that the courts should not originate provisions with respect thereto, but should confine themselves to interpreting and applying them. *Northern Pacific Railroad Co.* v. *Washington, ex rel. Dustin,* 142 *U. S.* 492; 35 *L. Ed.* 1092; and similar reasoning will be found in the case of *Delaware, Lackawanna and Western Railroad Co.* v. *Central Stockyard, &c., Co.,* 45 *N. J. Eq.* (18 *Stew.*) 50 (at *pp.* 65 *et seq.*), (Vice-Chancellor Van Fleet, 1889); *S. C. on appeal,* 46 *N. J. Eq.* (1 *Dick.*) 280." And again (at *p.* 441): "In this state, where we have no such administrative body, and where hardships and injuries may ensue to citizens and properties if railroads are allowed unrestrainedly to conduct their operations in a way to injure the citizen and his property, it is natural that applications should

be made to courts of equity to restrain such invasions of what the citizen esteems to be his rights." The determination was that the Court of Chancery could not regulate the business of a common carrier and determine at what time trains should be run and at what stations such trains should be stopped.

The solution of similar questions is to be determined by a balancing of the proofs as to the requirements of the public. and the exercise of sound business judgment. To solve such problems, the legislature created the Board of Public Utility Commissioners, *N. J. S. A.* 48:2-1. Its powers are enumerated in *N. J. S. A.* 48:2-13 as follows: "The board shall have general supervision and regulation of and jurisdiction and control over all public utilities as hereinafter in this section defined and their property, property rights, equipment, facilities and franchises so far as may be necessary for the purpose of carrying out the provisions of this title." The only limitation in the act is as to taxicabs, hotel buses, &c.

Mr. Justice Swayze said for the Court of Errors and Appeals in *Atlantic Coast Electric Railway Co.* v. *Public Utility Board,* 92 *N. J. L.* 168 (at *p.* 175) : "The board is given general supervision and regulation of and control over public utilities and over their property, property rights, equipment, facilities and franchises, so far as necessary to carry out the provisions of the act. The commission is given power, among other things, to fix just and reasonable rates, to fix just and reasonable standards, classifications, regula-tions, practices, measurements or service, to require railroads and street railways to establish and maintain just and reason-able connections with other lines."

Mr. Justice Black said in *Perth Amboy* v. *Board of Public Utility Commissioners,* 98 *N. J. L.* 106 (at *p.* 108) : "What was said in the case of *Atlantic Coast Electric Railway Co.* v. *Public Utility Board,* 92 *N. J. L.* 175, is pertinent. It evi-dently meant (*i. e.,* the act creating the board) to give full control of all public utilities to the board thereby created so far as it could be done by legislation. *Atlantic Coast Electric Railway Co.* v. *Public Utility Board,* 89 *Id.* 407 ; *O'Brien* v. *Board of Public Utility Commissioners,* 92 *Id.* 44, 46." And again (at *p.* 109) : "When a state tribunal has, after due

hearing, passed on a question within its jurisdiction, and with whose determination it is charged by statute its findings should not be reversed, unless unwarranted in law or unfounded in fact, or unless a discretionary power has been plainly abused. *Borough of Collingswood* v. *Water Supply Commission*, 84 *N. J. L.* 112."

*N. J. S. A.* 48:2-24 is as follows: "If any public utility shall discontinue service and the board after hearing upon notice shall find and determine that service should be resumed, the board may order that service be resumed forthwith or on such date as it may fix."

Resumption of an unnecessary service would not be ordered. No commission would order that to be done which did not serve a sufficient number of the public to justify the expense. The practice of the utility, in petitioning the Board before taking action, was suggested to be the more polite and politic method rather than by arbitrary change. *O'Brien* v. *Public Utility Board*, 92 *N. J. L.* 44.

No case, in this state, holds that a railroad must operate both a freight and passenger service. The Board has frequently granted the right to discontinue a little used service and it is inconceivable that the legislature should mean by the passage of the forward looking Public Utility Act that valued materials, the property of the utility, should be wasted in a little used service when parallel accommodations of a slightly different sort are available. If buses are not available and the rationing of automobiles becomes a factor in national defense, the discontinued service can be restored by a simple order of the Commission.

Now, as to the question of the reasonableness of the order. The Penns Grove branch from Woodbury to Penns Grove from January 1st, 1938, to August 31st, 1939, was operated for an average of a few more than twelve passengers per train. On the Bridgeton branch, Glassboro to Bridgeton. the average number of passengers per train was 14.3. On the Salem branch. Woodbury to Salem, thirteen passengers per train. The revenues were insufficient to cover the cost of operation and the tables show a growing lack of use of the service. All lines were short lines and it is common knowledge that for

short distances the public have chosen, to a large extent, to travel by other means than railroads.

The defendant utility, since unification, has operated at a deficit. If some plan for a more economical management cannot be devised, they will be abandoned with the resulting disruption of all classes of service.

There can be no doubt of the power of the Utility Commission to grant the order under review. The act creating the Board is clear. It was so contemporaneously construed. It was intended to safeguard the interests of the utilities and the public. The proofs abundantly support the action taken. The utility, unable to increase its rates, cannot be required to operate a service which is exhausting its surplus.

The writ is dismissed, with costs.