PENNSYLVANIA-READING SEASHORE LINES, APPELLANT,
v. BOARD OF PUBLIC UTILITY COMMISSIONERS, ET
AL., RESPONDENTS.

Argued May 15, 1950—Decided June 19, 1950.

*Mr. James D. Carpenter* argued the cause for the appellant (*Messrs. Carpenter, Gilmour & Dwyer*, attorneys).

*Mr. James M. Davis, Jr.,* argued the cause for the respondents.

The opinion of the court was delivered by

VANDERBILT, C. J. This is an appeal from a judgment of the Appellate Division of the Superior Court affirming an order of the Board of Public Utility Commissioners directing the appellant railroad to continue to operate its trains Nos. 828 and 829 on its Penns Grove Branch daily except Saturdays and Sundays.

The Penns Grove Branch, 20.3 miles in length, running from Woodbury to Penns Grove, is virtually paralleled by a Public Service bus route. On July 22, 1949, the railroad gave notice to the respondent Board of Public Utility Commissioners that commencing September 25, 1949, it would withdraw all passenger service on the Penns Grove Branch. The Board ordered the railroad to show cause why the proposed discontinuance would not constitute a violation of its obligation to provide passenger service and why such service should not be ordered continued. On September 12, 1949, a public hearing was held by the Board on the order to show cause. At this hearing, of which due notice was given as directed by the Board, no passengers of the railroad appeared to object, the only opposition to the discontinuance of passenger service coming from the representatives of the labor unions, members of which would be affected by the cessation of service.

The uncontroverted evidence at the hearing showed that the daily number of passengers (excluding, of course, Saturdays and Sundays) during the period from January 1 to August 31, 1949, averaged 6.2 on train No. 828 and 8.1 on train No. 829. During this period the total revenue derived from such passenger service was $767.13, while the total out-of-pocket cost of operations was $9,262.28. An exhibit of the financial results of the operations of both passenger and freight service on all of the appellant's rail lines disclosed that, with the exception of the war years 1943-1944, each year from 1934 to 1946 resulted in an operating deficit. The deficit for the first half of 1949 was $3,371,275, and for the year 1948 $4,195,386. The balance sheet of the railroad for December 31, 1948, showed an accumulated deficit of $37,379,107. The Board of Public Utility Commissioners found that:

"In our opinion the evidence wholly fails to support a finding that public convenience and necessity require continuance of passenger train operation on the Penns Grove Branch between Woodbury and Penns Grove. The continuing deficits experienced in the operation of the branch and the entire system of the Pennsylvania-Reading Seashore Lines jeopardize essential services performed by the utility. Continued operation of non-esential service at a substantial continu-

ing loss, particularly where as here another means of reasonably convenient public transportation is available, is, in our opinion, not justified as in the public interest."

Despite this unequivocal finding the Board, considering itself bound by the decision in *O'Connor v. Board of Public Utility Commissioners*, 129 *N. J. L.* 263 (*E. & A.* 1942), ordered the operation of Trains Nos. 828 and 829 continued. An appeal was taken to the Appellate Division of the Superior Court which affirmed the order below solely on the grounds of the *O'Connor case*. From the order of affirmance there an appeal has been taken to this Court.

Three questions are presented on the appeal: (1) should the *O'Connor case* be overruled as being unsound; (2) does the order of the Board of Public Utility Commissioners deprive the railroad of its property in violation of Article I, paragraphs 1 and 20 of the New Jersey Constitution and the Fourteenth Amendment to the Federal Constitution; and (3) does the order of the Board place an undue burden on interstate commerce in violation of Article I, Section 8, clause 3 of the Federal Constitution?

We are of the opinion that all three issues must be resolved in the affirmative.

(1) To answer the first question it is necessary to re-examine the reasoning of the decision in the *O'Connor case*. There the same railroad applied to the Board of Public Utility Commissioners for permission to discontinue passenger service on three branch lines. After a hearing, at which numerous passengers appeared and objected, the Board granted the application on the ground that public necessity and convenience did not require such service. On *certiorari* to the former Supreme Court (128 *N. J. L.* 35; 1942) the power of the Board of Public Utility Commissioners to order a discontinuance of all passenger service when it is reasonably considered unnecessary was unanimously upheld. On appeal to the Court of Errors and Appeals (129 *N. J. L.* 263; 1942) the judgment of the former Supreme Court was reversed and judgment entered denying the application of the railroad. The rationale of the opinion of the Court of Errors and Appeals was that

"the cessation of the carriage of passengers would be clearly a breach of the contract [the railroad's franchise from the State], and further that no power of the Utility Board to waive this contract obligation and erase it from the contract is conferred by statutes either expressly or by implication." (*Idem.*, *p.* 268.) A dissenting opinion was filed by Mr. Justice Heher and concurred in by Mr. Justice Colie and Judge Wells, expressing the view that "the Utility Commission has time and again over the years exercised, apparently without question, the authority here challenged; and, with knowledge of this judicial and administrative construction, these provisions were re-enacted without substantial alteration in the revision of our general public laws adopted in 1937. Such judicial and administrative construction must be deemed to have received legislative approval by the re-enactment of the statutory provisions without material change."

The statutory language that the majority of the court in the *O'Connor case* regarded as placing a contractual duty on a railroad to operate both passenger and freight service and as limiting the regulatory powers of the Board of Public Utility Commissioners is to be found in the Railroad Act, *R. S.* 48:12–99;

"Every railroad company shall start and run trains for the transportation of persons and property at regular times to be fixed by public notice.

"Every railroad company shall furnish sufficient accommodations for the transportation of all such passengers and property as shall within a reasonable time previous thereto be offered for transportation at the place of starting, the junctions of other railroads and at usual stopping places established for receiving way passengers and freight for that train.

"The company shall take, transport and discharge such passengers and property at and from and to such places, on the due payment of the legal fare or freight and shall be liable to the party aggrieved in an action for damages for any neglect or refusal in the premises."

The majority opinion, however, ignored equally pertinent provisions of the Railroad Act. Thus, *R. S.* 48:12–14 provides in part:

"Every railroad company, in addition to the powers conferred by its charter or by any act or certificate under which it is or shall be

incorporated, and notwithstanding any limitation expressly or impliedly imposed by any general or special law or by any act or certificate under which it is incorporated, may:

"c. Sell or otherwise dispose of any of its property, franchises, privileges or rights or any part thereof.

"Nothing herein contained shall authorize any railroad company to exercise any of the powers conferred upon it by this section, without the approval of the board of public utility commissioners where such approval is required by law."

and *R. S.* 48:12–90 further provides:

"No railroad company shall, without first obtaining the approval of the Board of Public Utility Commissioners, abandon any railroad station, stop the sale of passenger tickets or cease to maintain an agent to receive and discharge freight at any station in this state at which passenger tickets are regularly sold or at which such agent is maintained."

Likewise it is important to consider the provisions of the Public Utilities Act setting forth the powers of the Board of Public Utility Commissioners. *R. S.* 48:2–13 declares:

"The board shall have general supervision and regulation of and jurisdiction and control over all public utilities as hereinafter in this section defined and their property, property rights, equipment, facilities and franchises so far as may be necessary for the purpose of carrying out the provisions of this title.

"The term 'public utility' shall include every * * * steam railroad. * * *"

and *R. S.* 48:2–23 provides:

"The board may, after hearing, upon notice, by order in writing, require any public utility to furnish safe, adequate and proper service and to maintain its property and equipment in such condition as to enable it to do so."

and *R. S.* 48:2–24 sets forth:

"If any public utility shall discontinue service and the Board after hearing upon notice shall find and determine that service should be resumed, the board may order that service be resumed forthwith, or on such date as it may fix."

When all of these statutory provisions are read *in pari materiae* and an effort is made to give them all meaning and effect, it is reasonable to conclude that the Legislature did

intend to give the Board of Public Utility Commissioners the power that it had exercised for many years until the decision in the *O'Connor case* forbade it and which it felt constrained in the instant case not to exercise solely because of that decision. This conclusion becomes inescapable when the two constitutional questions hereinbefore posed come to be considered, for in the view we take of each of them (to be dealt with later in this opinion) the statute as construed in the *O'Connor case* would be unconstitutional. Obviously that construction of the statute is to be preferred which would save it from being struck down as violative of our fundamental law. But this reasoning is also controlling when the practice aspects of the problem here presented are considered. It is common knowledge that there are a considerable number of railroads and branches of railroads in this State where freight service only has been rendered for years under the statutes as they had been construed before the *O'Connor case.* Even under the *O'Connor case* the Board admittedly has the power to reduce the number of station stops and the number of scheduled trains when justified by lack of patronage. Under the facts as they presently exist on the Penns Grove Branch of the appellant railroad one train a day each way is being operated for an average of about seven passengers, all of whom could ride the parallelling bus lines. Where is the limit of the Board's power to be drawn? Is it required to order the operation of passenger trains even though no passengers present themselves? Can it reduce the number of scheduled trains to one a week, or a month, or a year? It seems only reasonable and, to avoid the absurd, necessary to hold that it was the legislative intent to give the Board the power to permit a total discontinuance of passenger service when the public convenience and necessity no longer require such service. It seems unreasonable to interpret *R. S.* 48:12–99 as requiring the operation of passenger service in a situation when only a nominal number of passengers present themselves for transportation, where other adequate means of public transportation are available, and when such operation results in continued substantial losses.

To reason, as the majority did in the *O'Connor case,* that a railroad must provide *both* passenger and freight service on penalty of forfeiting its franchise to operate as a railroad not only does violence to the legislative intent, but it is against sound public policy. It may well be, in fact experience on various railroads and branches in this State has demonstrated that it is, to the advantage of the public to have a railroad continue as a carrier of freight only rather than have its franchise forfeited. The Legislature very obviously realized that the regulation of public utilities is a continuing process, that circumstances in a given utility may and do change, requiring new arrangements in the public interest in particular places or instances from time to time. If the Board may in the public interest, on findings of public necessity and convenience, order a particular service suspended, it may later in changed circumstances on a similar finding order it restored. The mere fact that a given railroad or branch or train is operating at a loss will not of itself justify suspension of any service. The Board must act in the light of all the facts and circumstances and its findings are subject to judicial review; see *Rule* 3:81.

It is urged on us that the construction put on the statute by the *O'Connor case* became a part of the statute which we may not change, that power residing solely in the Legislature. However, this rule of legislative acquiescence in the well settled interpretation of a statute is but one of several principles that may guide a court in arriving at the true meaning of a legislative act. It is no more than an aid in statutory construction and it is merely one factor in the total effort to give meaning to the language of the statute. Moreover, it has been held that "one decision construing an act does not approach the dignity of a well settled interpretation," *United States v. Raynor,* 302 *U. S.* 540, 552, 82 *L. Ed.* 413, 420, 58 *Sup. Ct.* 353 (1938). The doctrine here contended for is not uniformly controlling; it must not be permitted to fetter the courts in their search for light. The principle of *stare decisis* which lies behind the doctrine is entitled to respect, but it

must not blind us to realities; it is not an idol to be worshipped in following either a judicial precedent or an antecedent statutory construction. "We recognize that *stare decisis* embodies an important social policy. It represents an element of continuity in law, and is rooted in the psychologic need to satisfy reasonable expectations. But *stare decisis* is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience."; *Helvering v. Hallock,* 309 *U. S.* 106, 119, 84 *L. Ed.* 604, 612, 60 *Sup. Ct.* 444 (1940). In *Kimberly School v. Montclair,* 2 *N. J.* 28 (*Sup. Ct.* 1949), we had occasion recently to strip from the Tax Act a false judicial gloss that had grown up on the statute in a long series of cases. Nor was the suggested doctrine applied in the *O'Connor case* itself, which changed the previous construction that had been placed on these statutes by the Court of Errors and Appeals in *Atlantic Coast Electric Railway Company v. Board of Public Utility Commissioners,* 92 *N. J. L.* 168 (*E. & A.* 1918). despite the fact that the dissenting opinion in the *O'Connor case* specifically called attention (at *p.* 270) to the legislative acquiescence for many years in the earlier construction of the statutes under consideration. In addition to the several reasons hereinbefore mentioned for overruling the *O'Connor case,* there is an especial reason for holding that the suggested doctrine should not apply here: in the *O'Connor case* the constitutional issues now presented to us were not raised. briefed or argued by counsel or considered by the court save in the dissenting opinion. "Lack of thorough consideration will reduce—even destroy—the weight of the very *ratio decidendi.* There are numerous examples. First, there may be no argument; and then there certainly cannot be thorough consideration * * *." *Wambaugh, "How to Use Decisions and Statutes"* in *Abbott, ed. Brief Making and the Use of Law Books* (1906), *p.* 93; "As it is the office of the court to pronounce a decision after having fully examined the ques-

tion presented and the law relating thereto, and as it is the office of counsel to aid the court by presenting the questions and the law with the fulness that comes from long familiarity with the case and from thorough examination of authorities, a case decided after little or no argument has not full weight." *Wambaugh on The Study of Cases* (1894), *p.* 46. See also 14 *Am. Jur.* 290, § 73.

(2) If the *O'Connor case* were upheld, we would nevertheless be constrained to vacate the order of the Board of Public Utility Commissioners in the instant case, since it violates Article I, paragraphs 1 and 20 of the New Jersey Constitution and the Fourteenth Amendment to the Federal Constitution. There can be no doubt of the power of a state functioning through an administrative body to regulate the services and facilities of common carriers so that the public necessity and convenience will be accommodated, but that power is not unlimited; it is circumscribed by the provisions of the United States Constitution. Under the guise of regulation the property of a railroad may not be taken by requiring it to furnish services or facilities not reasonably necessary to serve the public. *Wisconsin M. & P. R. Co. v. Jacobson,* 179 *U. S.* 287, 45 *L. Ed.* 194, 21 *Sup. Ct.* 115 (1900); *Washington ex rel. Oregon R. & N. Co. v. Fairchild,* 224 *U. S.* 510, 56 *L. Ed.* 863, 32 *Sup. Ct.* 535 (1912); *Northern P. R. Co. v. North Dakota ex rel. McCue,* 236 *U. S.* 585; 59 *L. Ed.* 735, 35 *Sup. Ct.* 429 (1915); *Chicago, M. & St. P. R. Co. v. Wisconsin,* 238 *U. S.* 491, 59 *L. Ed.* 1423, 35 *Sup. Ct.* 869 (1915); *Mississippi R. Com. v. Mobile & O. R. Co.,* 244 *U. S.* 388, 61 *L. Ed.* 1216, 37 *Sup. Ct.* 602 (1917); *Brooks-Scanlon v. Railroad Commission,* 251 *U. S.* 396, 64 *L. Ed.* 323, 40 *Sup. Ct.* 183 (1920); *Norfolk & W. R. Co. v. Public Service Com.,* 265 *U. S.* 70, 68 *L. Ed.* 904, 44 *Sup. Ct.* 439 (1924); *Atchison, T. & S. F. R. Co. v. Railroad Com.,* 283 *U. S.* 380, 75 *L. Ed.* 1128, 51 *Sup. Ct.* 553 (1931); *Interstate Com. Com. v. Oregon-Wash. R. & Nav. Co.,* 288 *U. S.* 14, 77 *L. Ed.* 588, 53 *Sup. Ct.* 266 (1933). The mere fact that the carrier was given an opportunity to be heard prior

to the entry of the order appealed from is not sufficient to establish its validity, "For the guaranty of the Constitution extends to the protection of fundamenal rights,—to the substance of the order as well as to the notice and hearing which precede it. * * * So that where the taking is under an administrative regulation, the defendant must not be denied the right to show that, as a matter of law, the order was so arbitrary, unjust or unreasonable as to amount to a deprivation of property in violation of the Fourteenth Amendment." *Washington ex rel. Oregon R. & N. Co. v. Fairchild,* 224 *U. S.* 510, 524, 56 *L. Ed.* 863, 868, 32 *Sup. Ct.* 535 (1912). That to compel a railroad to continue to operate even a branch at a pecuniary loss may constitute an unlawful taking of property has been firmly established, *Brooks-Scanlon v. Railroad Commission, supra,* 251 *U. S.* 396, 64 *L. Ed.* 323, 40 *Sup. Ct.* 183 (1920), although it is recognized that other factors must be considered in determining the reasonableness, and thereby the constitutionality, of the order. "As the duty to furnish necessary facilities is coterminus with the powers of the corporation, the obligation to discharge that duty must be considered in connection with the nature and productiveness of the corporate business as a whole, the character of the services required, and the public need for its performance." *Atlantic C. L. R. Co. v. North Carolina Corp.,* 206 *U. S.* 1, 26, 51 *L. Ed.* 933, 945, 27 *Sup. Ct.* 585 (1907).

Applying these principles to the facts in the instant case, it is obvious that the action of the Board in ordering a continuation of passenger service on the Penns Grove Branch was patently arbitrary and unreasonable and therefore unconstitutional. It was specifically found by the Board after a public hearing on due notice that the continued operation of such service was not required by public necessity or convenience. Its order was founded solely on the ground that the decision in the *O'Connor case* left the Board without discretion; that under the statutes as there construed it was mandatory for the railroad to continue to operate passenger trains, even though such operation was entirely unnecessary and could

only be carried on at a continued and substantial loss. If the situation were such that the branch line was serving a real public need of passengers or the railroad as a whole was making a profit although this particular branch was operating at a loss, the problem would be an entirely different one; in either of these events, to order the railroad to continue service might not be arbitrary and unreasonable in view of all the circumstances. But here the branch line serves no public need for passenger service and not only the branch line but the entire railroad has been operating at a loss for a considerable number of years.

The respondents contend that the principles of regulation we have enunciated are not applicable to the instant case. They argue that they apply only where the question is one of the degree of service and the duty of the utility a relative one, but that here the duty of the railroad to operate a minimum of passenger service is an absolute obligation upon the performance of which its corporate franchises are contingent and such an absolute obligation voluntarily assumed cannot be avoided, and the enforcement of it does not deprive the railroad of any constitutional rights. A public utility, it is argued, cannot, because of pecuniary loss, escape obligations voluntarily assumed. Applicable though the above contentions may be in a case where a utility is required to furnish a necessary public service at a loss (a question not now before us), we cannot consider them controlling in this case where there is no public need as shown by the unequivocal finding of the Board in which we concur. Where the public necessity and convenience do not require a particular service, there can be no obligation upon a public utility to furnish such service. The obligation is dependent upon the need; without the need, the obligation does not exist.

The cases relied upon by the respondents are not inconsistent with the position we take here. In *Missouri, Pacific Railway Co. v. Kansas,* 216 *U. S.* 262, 54 *L. Ed.* 472, 30 *Sup. Ct.* 330 (1910), the corporate charter required the railroad to furnish both passenger and freight service. The state ordered the

railroad to run a separate train for passengers, rather than a mixed train for passengers and freight as had been customary. The railroad objected to the order on constitutional grounds, because of the fact that the service ordered could only be furnished at a loss. It was stated by Mr. Justice White (at *p. 279, L. Ed., p.* 479) : "It may not be doubted that the road, by virtue of the charter under which the branch was built, was obliged to carry passengers and freight, and therefore as long as it enjoyed its charter rights was under the inherent obligation to afford service for the carrying of passengers." But in that case the state board had specifically stated in its findings (at *p. 268, L. Ed., p.* 475) : "The board believes that the people along the line of the Madison branch of said company are entitled to better passenger train service than they are now receiving, and it has been represented to the board of [by] officers of said company that the respondent is constructing motor cars for establishment on its branch lines, that can be operated at a much less expense than steam service." So we find that not only was there a public need, but the railroad was well aware of it. It was not there contended, as it must be here conceded, that the order was unreasonable and arbitrary because it required the railroad to perform a futile task; the order was attacked only on the ground that to comply would result in a pecuniary loss.

*Chesapeake & O. R. Co. v. Public Service,* 242 *U. S.* 603, 61 *L. Ed.* 520, 37 *Sup. Ct.* 234 (1917), is the case most heavily relied upon by the respondents. In that case the railroad instituted proceedings to set aside an order requiring it to maintain daily passenger service on a branch line in addition to the freight service already being rendered. The order was assailed as violative of the "due process" and "equal protection" clauses of the Fourteenth Amendment in that the passenger service contemplated by the order would entail a pecuniary loss of indefinite duration, though there was nothing to indicate that the company's operations as a whole would not yield a reasonable return. The court after finding that the railroad's charter, by virtue of the statutes under which

it was organized, required the transportation of passengers as well as of freight, stated (at *p.* 607, *L. Ed., p.* 522): "An obligation to use it for both was imposed by law, and so could not be thrown off or extinguished by any act or omission of the railway company. It follows that the order, instead of enlarging the public purpose to which the line was devoted, does no more than to prevent a part of that purpose from being neglected." It is this language of the court that the respondent relies upon to support its position in the instant case. It is noteworthy, however, that the court in the *Chesapeake case* did not stop with the above quoted words, but continued immediately: "One of the duties of a railroad company doing business as a common carrier is that of providing reasonably adequate facilities for serving the public. This duty arises out of the acceptance and enjoyment of the powers and privileges granted by the state, and endures so long as they are retained. It represents a part of what the company undertakes to do in return for them, and its performance cannot be avoided merely because it will be attended by some pecuniary loss. * * * That there will be such a loss is, of course, a circumstance to be considered in passing upon the reasonableness of the order, but it is not the only one. *The nature and extent of the carrier's business, its productiveness, the character of service required, the public need for it, and its effect upon the service already being rendered, are also to be considered. * * * Applying these criteria to the order in question, we think it is not shown to be unreasonable."* If in the instant case these same criteria are applied to the order now before us, no conclusion can be arrived at, as we have already indicated, but that the order is arbitrary and unreasonable. Thus the very case chiefly relied upon by the respondents is authority for, not against, the position we here have taken.

We are also referred to the case of *Southern Ry. Co. v. South Carolina Public Serv. Com'n.,* 31 *F. Supp.* 707, 712 (1940), for a recent review of the authorities on this subject; see also *Atlantic Coast Line R. Co. v. Public Service Commis-*

*sion,* 77 *F. Supp.* 675, 685 (1948), for a still later discussion. Suffice it to say, however, that the case cited to us is not contrary to our conclusions, for it was there pointed out (at *p.* 714) that it was not unreasonable for the commission to consider the public convenience and that the service required was "undoubtedly of value to the communities served and is responsible for so small a portion of the loss."

 We are thus constrained by the authorities to hold that public convenience and necessity are the criteria against which any discontinuance is to be measured, regardless of whether there is partial or total discontinuance of a particular service. If the service sought to be withdrawn is not required by the public convenience and necessity, the railroad cannot be constitutionally required to render the same, regardless of whether the discontinuance be partial or entire. To so require, in either circumstance, would constitute an arbitrary and unreasonable taking of property for private purposes and without compensation, a violation of the "due process" provisions of our State and Federal Constitutions.

 (3) The last question raised on this appeal concerns the validity of the order of the Board when viewed in the light of Article I, Section VIII, clause 3 of the Federal Constitution. The appellant is an interstate carrier that has been operating at a loss for years. The Board found that "the continuing deficits experienced in the operation of the branch and of the entire system of the Pennsylvania-Reading Seashore Lines jeopardize essential services performed by the utility." In these circumstances to subject it to continued operation of an unprofitable branch, when the local need does not so require, imposes an undue burden on its interstate operations.

In *Chicago, B. & Q. R. Co. v. Railroad Commission,* 237 *U. S.* 220, 59 *L. Ed.* 926, 35 *Sup. Ct.* 560 (1915), a statute was declared invalid which required a railway company to stop at least one passenger train a day at towns on its line having a population of over 200 persons. Acting under this statute, the Railroad Commission issued its order requiring one of the plaintiff's through trains to stop at the small town of Cochrane,

Wisconsin. "The Commission expressing its view of the case presented, said: 'Independent of any statutory provision on the subject, we should feel constrained to hold that the existing passenger service afforded the village of Cochrane was adequate under the circumstances, and that, therefore, interstate trains could not be required to stop at that station.' And further: 'This statute deprives the Commission of any discretion in the matter. It fixes the *quantum* of passenger service for every station coming within the classification made.' " (at *p. 225, L. Ed., p. 929*). Thus the situation in that case is not unlike the one in the instant case, except that the Board here considered itself bound not to exercise its discretion because of a court decision rather than a statute. What the United States Supreme Court said in that case when the order was attacked as violative of the "commerce clause" is of special interest here: "In reviewing the decision [of the State Supreme Court upholding the order of the Railroad Commission] we may start with certain principles as established: (1) It is competent for a state to require adequate local facilities, even to the stoppage of interstate trains or the rearrangement of their schedules. (2) Such facilities existing,—that is, the local conditions being adequately met—the obligation of the railroad is performed, and the stoppage of interstate trains becomes an improper and illegal interference with interstate commerce. (3) And this, whether the interference be directly by the Legislature or by its command through the orders of an administrative body. (4) The fact of local facilities this court may determine, such fact being neecssarily involved in the determination of the question whether an order concerning the interstate train does or does not directly regulate interstate commerce, by imposing an arbitrary requirement." (at *p. 226, L. Ed. 930*). The court proceeded to test the adequacy and reasonableness of the local facilities by the standard established in *Atlantic Coast L. R. Co. v. Wharton, 207 U. S. 328, 335, 52 L. Ed. 230, 234, 28 Sup. Ct. 121* (1907), in which it was said: "It [adequate and reasonable facilities] is a relative expression and has to

be considered as calling for such facilities as might be fairly demanded, regard being had, among other things, to the size of the place, the extent of the demand for transportation, the cost of furnishing the additional accommodations asked for, and to all other facts which would have a bearing upon the question of convenience and cost." After considering these factors the court felt constrained to strike down the order and the state statute upon which it was based.

If in the case before us the order of the Board is tested by these principles, it is apparent at once that the burden placed upon the appellant railroad is an undue interference with its interstate operations. In *Colorado v. United States,* 271 *U. S.* 153, 70 *L. Ed.* 878, 46 *Sup. Ct.* 458 (1926), an order of the Interstate Commerce Commission was upheld which authorized a railroad to cease operation of a branch located wholly within a state on the grounds that the loss from the operation thereof would burden the railroad's interstate operations and local conditions did not require the service being rendered. It was there stated by the court (at *p.* 165, *L. Ed., p.* 884) : "The obligation assumed by the corporation under its charter of providing intrastate service on every part of its line within the state is subordinate to the performance by it of its Federal duty, also assumed, efficiently to render transportation services in interstate commerce. There is no contention here that the railroad by its charter agreed in terms to operate this branch regardless of loss. * * But even explicit charter provisions must yield to the paramount power of Congress to regulate interstate commerce."

In view of the unquestioned absence of local need and the wholly unnecessary financial burden placed upon the appellant railroad's interstate operations, it is difficult to see how it can be held that the order of the Board herein is other than an arbitrary, unreasonable and thereby illegal interference with interstate commerce.

The judgment below is reversed and the order appealed from is vacated.

CASE, J. (dissenting). I am of the opinion that the statute does not authorize the Board of Public Utility Commissioners to permit a railroad company to discontinue all transportation of passengers and at the same time retain its franchise as a common carrier and transport freight thereunder.

The State may rightly require of a common carrier that as a condition of receiving and retaining its charter it shall run trains for the transportation of persons. That much was conceded at the argument. The appellant railroad company holds its franchise under the authority of the Railroad Act which, by *R. S.* 48 :12–99, provides: *"Every railroad company shall start and run trains for the transportation of persons and property at regular times to be fixed by public notice."* I italicize those words because the presence of them in the enfranchising statute, which appellant accepted and under which it *continues* to transport property, distinguishes this case from the decisions and the reasoning of many of the cited cases in the federal courts and in the courts of sister states, and undoes much of appellant's argument. Clearly the statute (1) mandatorily requires the running of trains for the transportation of (2) persons and (3) property (4) on a fixed schedule. That dual application to persons and to property is neither arbitrary nor inept. Where there are persons there is freight. Conversely, if there were no persons there would be no freight. And regard must be had for the element of public policy, of which the Legislature alone is the judge, in compelling a railroad company to provide, and to be constantly ready to provide, both transportations. The transportation of freight is and has been the more profitable of the two operations, but by the statute the one is a necessary concomitant of the other.

The Legislature having so ordained, it could, of course, remove or vary the mandate. It is the contention of the appellant that the Legislature did that when it created the Board of Public Utility Commissioners and invested the Board with certain powers. The basic authority given to the Board of

Public Utility Commissioners is in *R. S.* 48:2-13, which provides:

"The board shall have general supervision and regulation of and jurisdiction and control over all public utilities as hereinafter in this section defined and their property, property rights, equipment, facilities and franchises so far as may be necessary for the purpose of carrying out the provisions of this title.

"The term 'public utility' shall include every * * * steam railroad * * *."

I suggest that the authority to supervise and regulate a utility does not include the power to relieve the utility from the elemental functions which it is the duty of the Board to supervise and regulate. If the Board may authorize the discontinuance of passenger service with the retention of the railroad franchise, it may likewise authorize the termination of the freight service; and if it may terminate either branch of the service it may terminate both branches under like conditions and with like effect; the test being, according to the argument, whether the service is, on the one hand, required, in the opinion of the Board, by public convenience and necessity and, on the other hand, is profitable or unprofitable to the railroad. Nowhere in any of the statutes is there a stated purpose that the Board may permit a railroad completely to cease operations of either of the two primary functions for which it was chartered. The order under appeal permitted a reduction in the transportation of persons to the utmost extent short of absolute termination. It retained one car each way on five days of the week, with no service on Saturday or Sunday—a skeleton service which barely met the charter mandate that passenger trains should be run at regular times to be fixed by public notice. That car is literally a single car, known as a "rail motor" with capacity of thirty miles per hour as top speed.

It is said that the authority contended for was given in paragraphs *R. S.* 48:2-23 and -24. These paragraphs respectively provide:—

*R. S.* 48:2-23.

"The board may, after hearing, upon notice, by order in writing, require any public utility to furnish safe, adequate and proper ser-

vice and to maintain its property and equipment in such condition as to enable it to do so." .

*R. S.* 48:2–24.

"If any public utility shall discontinue service and the board after hearing upon notice shall find and determine that service should be resumed, the board may order that service be resumed forthwith or on such date as it may fix."

There is nothing in either of those provisions which anticipates a complete discontinuance of either of the two fundamental functions of a railroad company, namely, the transportation of persons and the transportation of property. Every paragraph of the statute should be given its proper setting and be construed with respect to its context. Article 2 of the statute is divided into three divisions designated, respectively, "A," "B" and "C." "A" has the caption "Jurisdiction" and consists of three sections, 13, 14 and 15, from which I have quoted the pertinent provision in section 13, *supra.* "B" is captioned "Powers" and embraces sections 16 to 29, inclusive, within which are sections 23 and 24, last quoted above. Section 16 is sub-captioned "Supervisory and regulatory powers in general," and sections 17 to 29 are, as a reading of them will indicate, a particularization of those supervisory and regulatory powers. Section 23 provides that the Board may require a utility to furnish safe, adequate and proper service, and section 24 provides that if any utility shall discontinue service the Board may order it resumed. Without doubt the services here referred to are, in the case of a railroad, the multifarious services incidental to the transportation. of persons and property; items of service that come within the field of regulation and control. Nothing short of a radical departure from the purpose and spirit of the statute would permit the words "discontinue service" in section 24 to be otherwise interpreted. The construction given by the Board of Public Utility Commissioners under the present application was that it could, and accordingly it did, order the discontinuing of certain trains but that it could not, and consequently it did not, make an order discontinuing all passenger transportation. That was a ruling within the meaning of the

act; and, if in the light of future events the board should hereafter determine that those discontinued trains should be restored, an order to resume that service would be within the specific authority of section 24.

Every question presented on this appeal was considered by the Court of Errors and Appeals in the determination of *O'Connor v. Board of Public Utility Commissioners,* 129 *N. J. L.* 263 (*E. & A.* 1942), and was specifically mentioned either in the opinion of the court or in the dissenting opinion filed with respect thereto. That decision is on all fours with the facts and the law of this case and is squarely against the contention of the appellant here. On the principle of *stare decisis* the decision should not be disturbed except for the most cogent reasons. *Cf. Colligan v. 680 Newark Ave. Realty Corp.,* 131 *N. J. L.* 520, 532 (*E. & A.* 1943). Not only so, but the decision, made in 1943, construed the statute which is determinative of the case, and since that time seven Legislatures have sat without amending the statute in this respect or otherwise expressing a view inconsistent with the interpretation of the statute as so rendered. The non-exercise of the amendatory power in the intervening period is indicative of legislative acquiescence in that judicial interpretation. *State v. Moresh,* 122 *N. J. L.* 77, 80 (*E. & A.* 1938). I do not enter upon the controversy whether meritoriously the body which has the power to give the desired relief ought to do so. My whole position is that the Board of Public Utility Commissioners has not that power; that the Legislature, and it alone, has the power and that the appeal for relief should be, but has not been, made to it.

Appellant argues under its first point that the *O'Connor case* is not sound and should be overruled. The argument is made of necessity. It undertakes to draw distinctions between this case and that; but there are no substantial distinctions.

Under that point it is also contended that the holdings in sister states are contrary to the determination in the *O'Connor case.* An examination of the cases cited in support of that

argument discloses that almost all are capable of being distinguished without conflict with the fundamentals of the *O'Connor* decision. It is not within the compass of this memorandum to analyze all of the citations so presented. A few will suffice:

*Commonwealth v. Fitchburg Railroad Company,* 12 *Gray* 180 (*Mass.* 1858). A few lines, which we italicize, reproduced from that opinion will show the inapplicability of it to the present issues—"The precise question therefore before us is, whether the running of regular passenger trains was, under the facts admitted by the demurrer, a legal duty? *Neither the statutes under which the respondents hold their franchises, nor the general laws regulating railroad companies, in terms impose upon the respondents such duty."*

*West Penn Rys. Co. v. Public Utility Commission,* 135 *Pa. Super.* 89, 4 *A.* 2d 545 (1939). The opinion quotes and relies upon the following provision of the Pennsylvania *statute* conferring authority upon the Public Utility Commission:— "Upon approval of the commission, evidenced by its certificate of public convenience first had and obtained, and upon compliance with existing laws, and not otherwise, it shall be lawful: * * * (d) for any public utility to *dissolve, or to abandon or surrender, in whole or in part,* any service, right, power, *franchise,* or privilege * * *."

*Benson, et al., v. Maloy,* 141 *Md.* 398, 118 *A.* 852 (1922). The specific *statutory* authority forming the groundwork for that decision included this language:—"The provisions of the next preceding section forbidding the construction by any common carrier, railroad corporation, or street railroad corporation, of a railroad * * * or the exercise by any such common carrier * * * of any franchise or right * * * without the permission and approval of the commission first obtained, and empowering the commission to grant such permission and approval whenever it shall after due hearing determine that such construction or such exercise of the franchise or privilege is necessary or convenient for the public service, *shall likewise apply to the abandonment or discontinuance in*

*whole or in part by any common carrier,* railroad corporation, * * * of *the exercise of any such franchise or* right, in so far as it is then actually being exercised for the public service * * *."

*Collins v. Public Service Commission,* 94 W. Va. 455, 119 S. E. 288 (1923), related to the *reduction* of a number of round trips to be made in passenger train service between certain cities, not to the complete termination of that service.

*Marshall v. Bush,* 102 Neb. 279, 167 N. W. 59 (1918), turned upon the attempt of the State of Nebraska to compel a railroad to transport passengers, at a loss, for a mileage compensation *limited to a two cent fare.*

Appellant's second point is that the order of the Public Utilities Commission in this case violates Article I, paragraphs 1 and 20 of the New Jersey Constitution. The first-named constitutional provision assures all persons of the right to acquire, possess and protect property, and the second prohibits the taking of private property for public use without just compensation. Those constitutional provisions do not operate against an act done with a person's consent and may not be used to protect a railroad company from complying with the condition to which it has impliedly agreed and under which it operates and retains its franchise.

Appellant's third and final point is that to compel the operation of passenger trains in this case denies the carrier the benefit of due process guaranteed in the Fourteenth Amendment of the United States Constitution, and also amounts to the placing of an undue burden on interstate commerce in violation of Article I, Section 8 of that Constitution. One of the United States Supreme Court decisions quoted at length in support of that point is *Railroad Commission v. Eastern Texas Railroad Company,* 264 U. S. 79, 68 L. Ed. 569 (1924). That decision went upon the attempt of the Texas Railroad Commission to *prevent the defendant railroad company from dismantling and abandoning its road* because it had found operation unprofitable. The court held that the usual permissive charter of a railroad company does not give

rise to any obligation on the part of the company to operate its road at a loss and if at any time it develops with reasonable certainty that future operation must be at a loss the *company may discontinue operation and get what it can out of the property by dismantling the road.* "To compel it to go on at a loss, or to give up the salvage value, would be to take its property without the just compensation which is a part of due process of law." It needs no analysis to distinguish that situation from the one existing here.

A further citation listed by appellant in support of its argument is *Chesapeake & Ohio Railway Company v. Public Service Commission of the State of West Virginia,* 242 *U. S.* 603, 61 *L. Ed.* 520 (1917). There the Court of Appeals of the State of West Virginia had refused to suspend or vacate an order of the Public Service Commission of that state requiring the installation and maintenance of passenger service on a branch railway line. The United States Supreme Court, reviewing that decision, held that "in legal contemplation, the branch line was devoted to the transportation of passengers, as well as of freight, even though actually used only for the latter. An obligation to use it for both was imposed by law, and so could not be thrown off or extinguished by any act or omission of the railway company. It follows that the order, instead of enlarging the public purpose to which the line was devoted, does no more than to prevent a part of that purpose from being neglected."

Dealing directly with the allegation that railroad property was being taken without due process of law because a train was ordered run at a pecuniary loss Mr. Justice (later Chief Justice) White, speaking for the United States Supreme Court, said in *Missouri Pacific Railway Company v. Kansas,* 216 *U. S.* 262, 54 *L. Ed.* 472, 479 (1909):

"It may not be doubted that the road, by virtue of the charter under which the branch was built, was obliged to carry passengers and freight, and therefore, as long as it enjoyed its charter rights, was under the inherent obligation to afford a service for the carrying of

passengers. In substance, this was all the order commanded, since it was confined to directing that the road put on a train for passenger service."

A review of the cases on the contentions that the order of the Board was so arbitrary and unreasonable as to amount to a denial of the due process and equal protection guaranteed by the Fourteenth Amendment, and that, since the loss arising from the operation must be paid from revenues derived from interstate commerce, the order constituted a burden upon that commerce in violation of the commerce clause of the United States Constitution will be found in *Southern Railway Co. r. South Carolina Public Service Commission*, 31 *F. Supp.* 707, at 711, *et seq.* (*Dist. Ct. E. D. South Carolina* 1940).

The point is not well made.

Appellant seeks support for its position in the fact that at the hearing by the Board there was no protestants except railroad employees. I attribute no force to that contention. The issue, as I see it, does not lie in public support or opposition but in the inherent absence of authority on the part of the Board to put a complete end to passenger transportation.

If, however, the participation or lack of it by the public in the controversy may be considered important, it is well to look at the procedure. The general public was not really put on notice. The company advised the Board of Public Utility Commissioners that it proposed to terminate all transportation of passengers on the Penns Grove Branch, a line extending 20.3 miles through a sparsely settled country, occupied by fourteen small communities. The Board issued an order *directing the railroad company to show cause* why the proposed withdrawal of the service should not be deemed in violation of law. Notice was posted in the railroad trains in question and at the stations of that branch, places which, according to the railroad contention, were patronized by exceedingly few people. I find no proof of other notice. The order was made August 24, 1949. The hearing was on September 12, 1949— less than three weeks from the date of the order. The time began during the period when, of all the year, people are most

apt to be away on vacation, and ended a little more than a week after Labor Day. The opportunity for crystallization of sentiment and for organization of opposition was slight even if the inhabitants of the area had, from the nature of the proceeding, apprehended that there was a duty upon them to engage counsel or otherwise enter opposition. So this little group of small communities, without adequate notice of what was afoot, in the midst of the summer season, possibly indifferent to the outcome, is made the channel for reopening and reversing the decision of our court of last resort on this very important question. I suppose that, all things considered, the effort by a railroad company to be relieved of a charter obligation without going to the Legislature could hardly have had a more auspicious opportunity. But this decision will reach far beyond that little country branch. It establishes for all railroads and against all communities that a railroad company may, by order of the Board of Public Utility Commissioners, be relieved of its statutory duty to transport passengers. It must follow from this, as I have already suggested, that a railroad company may in like manner be relieved of its statutory obligation to transport freight, and that if this is true with regard to one or either, it is true with regard to both; and at the same time the company may retain its franchise subject to rejuvenation—a real threat to potential railroad competition. All this notwithstanding the Legislature has said that the duty of a railroad is to transport both persons and property at regular times and has by inaction during seven years indicated its acquiescence in the decision of our court of last resort that the Board of Public Utility Commissioners is without authority to relieve from that duty.

To summarize:—Our statute requires a railroad, as a condition of its franchise, to transport both persons and property. It has given to the Board of Public Utility Commissioners the authority to supervise and regulate railroads in the performance of those irreducible functions. The authority to supervise and regulate of course assumes the performance of the duty to transport—else there would be nothing to super-

vise or regulate. Supervision and regulation embrace the maintenance of stations, the employing of agents, determination of the number of trains and the amount of rates and all the other incidents of operation. But the Legislature has never delegated to the Commission the power to permit a railroad to cease operating either or both of those fundamental functions and still retain its franchise. In all the wealth of citations, state and federal, I have not discovered one which rules against the right of a state to maintain that position; nor have I discovered one which concedes to the federal authorities the right to relieve a railroad, in such an instance, of the duty to transport passengers and to retain to it a franchise to carry freight. *Colorado v. United States,* 271 *U. S.* 153, 70 *L. Ed.* 878, 46 *Sup. Ct.* 458 (1926), sustained the authority of the Interstate Commerce Commission to permit a railroad to *completely abandon* the operation of a branch, but that is not our case. What the Interstate Commerce Commission would do if confronted with the present problem, we do not know. I am satisfied it would do nothing unless provided with more extensive and detailed proofs than are in the present record; but that touches upon the powers of the federal commission and upon the economic *status,* with neither of which my position is concerned. I do not entertain the view that because the Interstate Commerce Commission, acting under federal powers and in the control of commerce between the states, may override a state statute, our Board of Public Utility Commissioners, subject to the limitations upon its delegated authority, has the same power.

Those are my reasons for voting to affirm the judgment below.

Mr. Justice Wachenfeld concurs in the foregoing dissenting opinion.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING and ACKERSON—5.

*For affirmance*—Justices CASE and WACHENFELD—2.